### BLEECKER *vs.* LYNCH.

*In the matter of proving the last Will and Testament of* JANE LYNCH, *deceased.*

THOUGH the statute does not require the husband of one of the heirs or next of kin to be cited on the probate of a will, yet it was proper to do so. But since the passage of the acts giving to a married woman the same rights in her separate property, as if she were a *feme sole,* there *seems* to be no necessity for citing the husband.

Defect of memory, unless it be total or appertain to things essential, is not sufficient to establish incapacity.

Advanced age, of itself, raises no presumption against the capacity of the testator.

The dependence of a mother upon a daughter for the management of her pecuniary and domestic affairs, is no ground for imputation of fraud by the

daughter, unless it be shown that circumstance was used as the means of coercion, restraint or imposition.

In the absence of any inconsistency between the provisions of a will, and the declarations of the testator, otherwise expressed, or of any affirmative evidence of fraud or undue influence, the Court will not speculate as to the motives of the testator, nor upon mere suspicion, presume procuration by artifice or undue means.

Allegations were filed against the will of the testatrix, within a year after its admission to probate. The testatrix, at the time of the execution of the will, was over 80 years of age. She gave all her property to an unmarried daughter who resided with her.

———

WM. WATSON, *for Contestants.*

I. John V. Bleecker, one of the persons to whom the citation is directed, not having been served with the same, the will was not proved according to law. (2 *R. S.*, 3*d ed.*, 127, § 51.)

1. He was a resident of this State. (*Story's Conflict Laws*, §§ 42 to 47, *and cases there cited.*)

But if a non-resident, and service was made by publication, the publication was insufficient, it being only 33 days.

2. Neither he nor his wife appeared on the probate of the will.

3. He is entitled to the personalty of his wife, being married in 1846. (*Holmes* vs. *Holmes*, 4 *Barb.*, 297.)

But if otherwise, as husband he is the protector of the rights of his wife, and the citation was directed to him, and should have been served on him.

II. Jane Lynch, the testatrix, did not possess a sound and disposing mind and memory, so as to be able to make a testamentary disposition of her property, with sense and judgment, in reference to the situation and amount of such

property, and the relative claims of the different persons who were the objects of her bounty. (*Clarke* vs. *Fisher*, 1 *Paige*, 173 ; *Clark* vs. *Sawyer*, 2 *Comstock*, 498 ; *Den* vs. *Johnson*, 2 *South*, 458 ; *Marquis Winchester's Case*, 6 *Coke's R.*, 23 ; *Mountain* vs. *Bennett*, 1 *Cox's Ch. Ca.*, 355 ; *Ray on Insanity*, 471.)

III. The will is unreasonable on its face, when taken in connection with the amount of her property, and the number and situation of her other children and relatives. (*Patterson* vs. *Patterson*, 6 *Serg. & Rawl.*, 56 ; *Clark* vs. *Fisher*, 1 *Paige*, 176 ; *Den* vs. *Johnson*, 2 *Southard's R.*, 458.)

IV. It appearing that the sole legatee (who as next of kin was entitled to but one-sixth of the decedent's estate), prior to and at the time of execution, had the entire control and management of the property of the testatrix, and was the " administrator" of her affairs, the *onus probandi* is on the legatee, to show that the testatrix executed the instrument with that knowledge of its nature, effect and consequences, and of the nature and amount of the property conveyed, and of the number and claims of her other children and relatives, which it was the duty of the legatee to communicate to her. (*Huguenin* vs. *Baisly*, 14 *Ves.*, 273 ; *Ingram* vs. *Wyatt*, 1 *Hagg.*, 401, 428, 355 ; *Earl of Portsmouth's Case*, 1 *Hagg.*, 366 ; *Gibson* vs. *Jeyes*, 6 *Ves.*, 278 ; *Billinghurst* vs. *Vickar*, 1 *Phillimore*, 137, 193, 200 ; *Hylton* vs. *Hylton*, 2 *Ves.*, 347 ; *Hatch* vs. *Hatch*, 9 *Ves.*, 992 ; *Bridgman* vs. *Green*, *Wilmot*, 70 ; *Griffith* vs. *Roberts*, 3 *Madd.*, 191 ; *Harwood* vs. *Boker*, 3 *Moore's Privy Counsel R.*, 290.)

The proof on the part of the executrix and legatee, does not go far enough. She, living alone with the testatrix and being present at the execution, cannot establish this will, by which she takes the whole estate and excludes the next of kin, who in law are entitled to five-sixths thereof, without affirmatively showing, that the testatrix was informed

of their claims, and of the amount of the estate she conveyed, and that the effect of the instrument was to exclude her other children from any share of her property. (*Harwood* vs. *Boker*, 3 *Moore's P. C.*, 290 ; *Huguenin* vs. *Baisly*, 14 *Ves.*, 273.)

V. If the testatrix was not absolutely incapable of making a will, yet the will that was admitted to probate is invalid.

1. The testatrix was 83 years of age and of decayed memory. It was executed under circumstances of clandestinity, in the presence of the sole legatee, with whom she lived alone, no other of her children being present. No mention was made by her or to her, of her four sons, who were not present. No mention to her or by her was made, of the nature of the estate conveyed. It was executed by the agency of her co-trustee, at whose request she had been in the habit of signing deeds, and attested by the commissioner who had usually taken her acknowledgments of such deeds. Her memory was not acted upon or aroused, so as to know the estate she conveyed, or the claims of other children not present.

2. No intention to exclude her other children from any share of her property, and to make the daughter sole legatee, was ever expressed by the testatrix at any period of her life. The testimony offered by the executrix is chiefly negative, and consists of opinions without facts, or facts of an insignificant character. That on the part of the contestants is affirmative, and consists of facts. (1 *Paige*, 172.)

3. In cases of undue influence, it is clear, instructions prove nothing, for the same power which produces one produces the other. (*Bridgman* vs. *Green*, *Wilmot*, 70.)

M. S. BIDWELL, *for Executrix.*

I. It was not necessary to cite the husband of Mrs. Bleecker, to attend the original probate. He was not one of the next of kin of the testatrix; nor since the statute for the protection of the rights of married women, entitled in right of his wife, to personal property accruing to her under the Statute of Distributions. (2 *Phill. R.*, 224.)

II. The probate of the will should be confirmed, the allegations not having been sustained.

1. Of all the family, no one opposes the will but Mr. and Mrs. Bleecker, or rather Mr. Bleecker.

It is not certain that he would have done it, if he had been here to make a personal investigation of the matter.

Probably this proceeding has grown out of the extreme anxiety of friends, not to lose any possible advantage for him.

At all events, the fact that no other next of kin has united in this proceeding, affords a fair presumption that they have not believed the will to be void.

The allegations are not sworn to by Mrs. Bleecker.

They were not filed until the last moment which the law allowed.

These circumstances afford presumption, that the parties themselves had great hesitation about their own allegations.

2. There is no proof of fraud, of importunity, or undue influence, artifice, and contrivance of Miss Lynch.

Importunity, if proved, must have been to such a degree as to deprive the testator of free agency; it must be such importunity as he is too weak to resist. (*Kindharde* vs. *Harrison*, 2 *Phill.*, 449; *Blanchard* vs. *Nestle*, 3 *Denio*, 37.)

3. There is no proof of any restraint or custody of the testatrix.

4. There is clear proof of express instructions given by

Mrs. Lynch herself to the gentleman who drew the will, and of the will being read to her before its execution.

5. There is abundant, or rather redundant evidence of her capacity at the time of the execution of the will.

It is doubtful whether there is any evidence of incompetency, according to strict legal principles. At any rate, it is greatly outweighed by the evidence in favor of the capacity of the testatrix, whether we regard the opinions of the witnesses, or the facts upon which their opinions were based, and the means they respectively possessed of forming a reliable judgment.

6. The dispositions contained in the will were, under the circumstances, natural and probable. (*Pauten* vs. *Williams*, 2 *Curteis*, 530.)

THE SURROGATE. The will of Jane Lynch was admitted to probate after some contest by several of the children of Henry Lynch, deceased, on the 19th of September, 1849. On the 19th of September, 1850, allegations were filed in the name of John V. B. Bleecker, and Sarah R., his wife, in the right of the latter as one of the next of kin of the testatrix. One of the grounds of objection was the want of service of a citation to attend the original probate, upon Mr. Bleecker. The statute directs the Surrogate on an application to prove a will, to ascertain *in limine*, "the names and places of residence of the heirs, widow, and next of kin," and then requires the citation to issue to "the proper person." The letter of the law does not require the husband of one of the heirs or next of kin to be cited, though when the rights of husband and wife were different from what they now are, it may have been proper to do so. Such has been the practice, but since the passage of the acts giving to married women the same right as a *feme sole* in their separate property, if the decedent has died since the enactment of those statutes, there seems to be no necessity for citing the husband. I do not, there-

fore, think the original probate irregular. If it were, the same party making the objection having now appeared, and in conjunction with his wife, put the executrix to proof *de novo*, and been admitted to contest the will, he has substantially enjoyed the right of a hearing.

The testatrix, Mrs. Jane Lynch, the widow of Dominick Lynch, deceased, made the will May 17, 1843, and died in July, 1849. The allegations charge incapacity on the part of the testatrix, and also procuration of the will by the artifice and undue influence of Miss Louisa Lynch, the sole legatee. The subscribing witnesses affirm a sound state of mind and memory ; and the burden of showing the contrary at the time the will was made, is upon the contestants. To establish this, and to show undue influence, they called five witnesses.

Dr. Hosack, who visited the testatrix professionally some time in 1840, 1841, or 1842, expresses the opinion that she was not then capable of " making a testamentary disposition of her property with sense and judgment ;" that although she was not an imbecile, her mind was impaired as to memory, and he does not think she was " capable of remembering all her children at the moment, if she were asked, and were unaided." He says himself that this is only an opinion, and he cannot say he ever brought it to a test. He mentions, however, her own statement, that " she was getting old, her mind was failing, and she did not depend upon herself at all. She said she now remembered nothing." The Doctor adds that he would not say it was so bad as that. He also states, that " she appeared to surrender herself wholly to her daughter's care and control, and was, as I think, entirely dependent upon her." These general expressions and opinions are strongly expressed, but I cannot overlook the circumstance, that the Doctor specifies no particular fact indicating loss of memory, while he says affirmatively, that she " would talk well and consistently upon ordinary topics of conversation."

The Rev. Dr. Olin, who first saw the testatrix in Decem-

ber, 1843, six months after the date of the will, gives the opinion that "her mind was then very much impaired," and bases this conclusion upon " her manner and incoherency" in attempting to explain to him where her residence was situated, when many years since she resided in Ghent or Bruges. He had been a year or two in Belgium, and she did not seem to him to describe her former residence " intelligibly." He also states, that he was prepared, from what he had previously heard, "to find her faculties impaired."

Mrs. Fitzgerald testifies to observing a change in the mind of the testatrix, and specifies the period of Dr. Olin's marriage and visit, as the time when the change was more noticed than at any other, and she spoke of it to that gentleman " to prepare him for what he might expect of (her) grandmother, as her mind was impaired."

Edward Lynch shows that the testatrix, for five or six years before her death, frequently mistook him for his cousin Dominick L. Lawrence, but after having been a few minutes in the room, she would tell him of her mistake. Mr. Lawrence mentions a similar occurrence when he called to see her, but does not think it was as early as 1845 ; and Mrs. Bolton mentions a single case of the kind, she thinks in April, 1843, when Mrs. Lynch mistook her for Mrs. Pringle. All these parties were grandchildren of the testatrix, and none of them express an unfavorable opinion as to her capacity.

This is all the evidence adduced to show the incompetency of the testatrix, and on its face it is palpably insufficient to establish a want of testable capacity, a deprivation of reason, or loss of understanding. Mrs. Fitzgerald points to no fact upon which her opinion was based ; Dr. Olin's opinion hinges upon a failure to identify satisfactorily the house in which she abode in Belgium, at an early period of life ; and Dr. Hosack expresses a general opinion as to the failure of her mind and memory. Not one of the witnesses on the part of the contestants, except Dr. Hosack

and Mrs. Bolton, speaks to the time of the execution of the will. The evidence of the others refers to a posterior date. I may remark here, that where the soundness of the mind is in question, it is only from positive facts and circumstances indicating mental derangement or imbecility, that we have reason to infer aberration or departure from the ordinary condition of the understanding. Proof of a rational state must generally be little more than a negation, by those who have enjoyed opportunities of observation, of such appearances or conduct, as show imbecility or loss of intellect. The strongest deduction from the testimony adduced to impeach the capacity of the testatrix, reaches no further than defect of memory, which, unless it be total, or appertain to things very essential, is not sufficient to create incompetency. The memory is the first faculty to wane in the progress of age. Its acquisitive power fails more than its retentive. Its weakness is shown not so much in forgetting old, as in not holding recent facts. As an instance of the fugitive nature of impressions made late in life, Dr. Rush mentions a German, who, at the age of 40, acquired our language, and though continuing to live here, had forgotten every word of it at 80, but still talked German fluently. Bishop Watson's father married and had a family very late in life, and when extremely aged, would ask twenty times a day the name of the lad (his son) at college, though he could "repeat without a blunder hundreds of lines out of classic authors." The soundness and vigor of the mind may remain after the memory is impaired. I attach but little importance to the testatrix's momentary mistakes as to her grandchildren, especially when they themselves do not undertake to question her general intelligence at the time. And with regard to the circumstance mentioned by Dr. Olin, it was the most natural thing in the world that she should not, after the lapse of many years, succeed in making him comprehend the precise locality of her residence in a foreign city. Such an identification would depend much upon the subsequent

changes in the place spoken of, and a variety of circumstances, besides the advantages the party had enjoyed for recognizing the description. It must be confessed that all these facts have no great weight in themselves, and would not be deserving of much consideration, were it not for the great age of the decedent. The effect of age upon the vigor of the mind varies so much according to individual constitution, that it is difficult to form a sound general conclusion on the mere fact of advanced age. In an intellectual sense, there is nothing in the mind, abstractly speaking, tending to decay; its loss of tone and power is consequent upon the ravages of time and disease upon the body, and especially the brain, upon which the understanding is dependent for manifestation. It is said that not more than 78 in 1000 die of old age; and it is scarcely possible to define the natural period of life, or its more frequent and regular limit, independent of disease and accident. Blumenbach observes, that by an accurate examination of numerous bills of mortality, he had ascertained the remarkable fact, "that a pretty large proportion of Europeans reach their 84th year." Haller gave a list of 221 persons who lived from 100 to 169 years; Easton, a list of 1712 who attained a century and upwards. The condition of the mind in these cases of course varied. In Madden's six tables of the ages of the most distinguished modern philosophers, jurists, artists, and authors, and in D'Israeli's Notes on "the progress of old age in new studies," there are the names of many men whose genius shone in full splendor to the close of an advanced life. I do not mean to gauge all cases by such remarkable instances, but advert to them to show that each individual must be judged by himself. The power and brilliancy of the mind in old age is an exception, but so is longevity itself. It may be observed in this connection, that the system frequently makes an effort at renovation in extreme old age, which is evinced in the cutting of teeth, the recovery of the original color of the hair, and of perfect vision and hearing. This is

said to occur more frequently in females, and indicates tone and strength in the nervous system, great vital power and recuperative energy. A fact of this kind occurred to the decedent, who about the time the will was made, recovered her vision, was able to read without spectacles, and to thread the finest needle. Taking the case, then, on the evidence of the contestants alone, I cannot perceive sufficient ground for believing the mind of the testatrix to have been seriously impaired.

Recurring to the evidence on the other side, the foundation of this conclusion is greatly strengthened. The subscribing witnesses, both intelligent men, one of them of much experience, had opportunities of frequent intercourse with the testatrix, and one of them had been for years her co-trustee in the management of a large estate at Rome, in which she was interested. Mr. Hone says he "was always struck with the intelligence she displayed for a lady of her age." Mr. De Peyster states that she was, "in every sense of the word, of sound mind and memory," that "he had unusual opportunities for ascertaining her capacity for business, from the transaction of the business of the trust with her. At the execution of the will, and some years afterwards, she was singularly intelligent. Her capacity was remarkable for a person of her age, or of any age." Mr. Ogden, who for ten years preceding her decease, was in the habit of calling on her once a year, on New Year's day, states that she was a woman of superior mind, and that in 1843 he observed "no loss of intelligence or memory. Her mind was then very good." Mrs. Davis, who visited her once a year after 1840, and generally spent an hour or two in conversation, says, that for the first three years she never observed any loss of memory; but after that period, how soon she does not recollect, she noticed a change; her hearing appeared worse, and she seemed more quiet. Mr. Roberts, who had been for many years agent of the Rome estate, and thus had the means, from personal intercourse and business transac-

tions, of forming a reliable judgment as to her capacity, saw her in August and September, 1843, and says, that at that time, "her mind appeared to be vigorous and strong," she was "in full possession of all her faculties," and he "observed no change in the powers or character of her mind from what he had previously known," nor "any loss of memory, weakness or imbecility, or that her faculties were any way impaired." Doctor Carter, who attended her daughter Louisa, in August, 1843, and saw the testatrix daily for several days, declares that he has "no reason now to doubt that her mind was then in a very good state." Judging from her conversation, and an argument she had with him on the subject of the church, he was of opinion, "she was a woman of very fine mind," and made that observation to others. Mr. Astor, an old acquaintance of the testatrix, and who visited her once a year, says, "before 1845, I never observed any thing that indicated a loss of intelligence or memory, but she seemed to be in excellent preservation of body and mind." Mrs. Schmidt, an intimate friend of the deceased from childhood, and a constant visitor at her house till her death, saw her in August and in October, 1843, and states that she appeared at that time "to be perfectly herself," and showed "no loss of intelligence or memory;" she also observes generally, "her mind was very strong and intelligent; I never left her without remarking how well she had retained her mind." Mrs. Astor, who visited the testatrix three or four times a year, testifies that in her opinion "her mind in its character was very bright; she was a woman of education and decision of character." In the fall of 1843, after Miss Lynch's illness, she called on her, and "did not observe any thing which indicated any loss of intelligence or memory." Mrs. Patterson states, that "she was a woman of very strong mind and decision of character," and also fixes the fall of 1843 as a period when she did not notice the least thing "that indicated any loss of decision of character and intelligence." Mr. Lawrence, a grandson of the

deceased, who lived many years in her family, until his marriage in 1839, and subsequently visited her weekly, states that "her mind was of a very strong and very decided character," that he saw her frequently in 1843, and "observed not the least loss of mind, memory, or intelligence."

The force of this evidence is irresistible, and I have no doubt that the mind of the testatrix was not only sound, but in a state of excellent preservation, unimpaired by the infirmities of age to any material degree. It is true that at the time of making the will she was infirm in body, kept her room, and depended upon her daughter for the management of her household affairs ; but in the language of Swinborne, "it is not the integrity of the body, but of the mind, that is requisite in testaments." (*Part* 2, § 5.) That illustrious Jurist, who lived to become a striking instance of clearness and vigor of the intellect at a venerable age, and who, under the constitutional provision which unseated a Judge at 60, retired from the bench to adorn the science of the law with a treatise remarkable for its research and learning, its lucid and perspicuous reasoning, its felicitous and comprehensive generalization, as well as for its classic elegance of style, made in a case somewhat similar to the present, some just remarks in relation to the will of a testator between 90 and 100 years of age, which he sustained by his decision. (*Van Alst* vs. *Hunter*, 5 *J. C. R.*, 148.) It is well understood, he said, and has been the doctrine of law in every age, that provided he has the competent possession of his mental faculties, "a man may freely make his testament, how old soever he may be." He adds in touching language, "it is one of the painful consequences of extreme old age, that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life, to command the attention due to his infirmities. The will of such

an aged man ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent acts, but contains those very dispositions which the circumstances of his situation, and the course of the natural affections dictated."

In the case now before me, there is an entire destitution of any evidence tending to impute fraud or undue influence to Miss Louisa Lynch, or indeed any interference whatever in the procuration of this will. Mr. De Peyster, who drew it, communicated with the testatrix and with her alone. Not a word passed between him and Louisa Lynch, on the subject of its contents, but he received the instructions from the testatrix in person, left the will, when drawn, with her for examination, and the next day attended on its execution. The only attempt to specify any fact from which an unfavorable inference might be drawn, relates not to the acts and conduct of the legatee, but to the declarations of the testatrix. Mrs. Bolton and Mrs. Fitzgerald state, that in 1843, the testatrix, as a reason for not giving presents, said, that her daughter Louisa " held the purse strings," or " had the money, she had none." These expressions were apparently apologetic, and their construction depends much upon this, as upon the tone and manner in which they were uttered. Besides, such declarations are uniformly considered in the cases, as of little, if any weight, especially when related at a distance of time; the accurate recollection of the precise words and the attending circumstances, and a proper understanding of the motives of the speaker, all being requisite to their just interpretation. It is urged, however, that the testatrix was dependent upon her daughter, for the management of her pecuniary and domestic affairs. In this there is no ground for imputation of fraud, unless it be shown that circumstance was used as a means of coercion, restraint or imposition. To imply fraud from filial virtue would be monstrous. That Miss Lynch was living alone with her mother at the time, does not justify an inference of undue

influence.   Says Senator Verplanck, in *Remsen* vs. *Brinck-erhoff*, 26 *Wendell*, 340, " the naked fact of a testatrix pre-ferring those relations or descendants, with whom she re-sides, to others at a distance, rather tends to support the will than to invalidate it ; and at any rate, ought not to ex-pose any one to the imputation of criminal artifice."   The amount of the property passing by this will, is some fifty thousand dollars ; the object of the testatrix's bounty was already in comfortable circumstances, and it is argued from this, that the will is unreasonable.   It is at all times dan-gerous, in the absence of any affirmative proof of an incon-sistency between the provisions of a will and the testamen-tary intentions otherwise expressed or declared, to attempt an inquiry into the motives of the testator, for the reason that it is very difficult to place ourselves in his position. But with the light afforded on this point by the evidence, I cannot say that the will is not consonant with the state of the decedent's feelings and dispositions, or that in view of the situation of her family, it was an unreasonable act. And it is certainly not unworthy of remark, that only one of her descendants presents these allegations, though others of the children of Henry Lynch opposed the original pro-bate.   It is sufficient, however, in the absence of proven fraud or undue influence, and where the requisite capacity exists, to stand by the will.   If its provisions be grossly unreasonable or absurd, or opposed to the ascertained dis-positions and affections of the party, these circumstances, if shown, may be of importance, as they reflect upon the question of capacity ; but a person of competent mind " is the disposer of his own property, and his will stands as a reason for his acts."   This aged lady had her only unmar-ried daughter living with her.   They never were separated ; the declining years of the parent were tended with filial duty ; " it was she," in the language of Chancellor Kent, " who alone survived to nurse her with a daughter's care, and to rock the cradle of reposing age."   To presume, without any other evidence than the mark of affection and

gratitude contained in this will, that this tie, broken only by death, was made the medium of undue control or artifice, that advantage was taken of existing relations, to work wrong and injustice, would be to surrender the mind to surmise and suspicion. I am constrained, therefore, after the best consideration I can give the case to pronounce against the allegations, and to confirm the original probate.