CAMPBELL *vs.* LOGAN.

*In the matter of proving the last will and testament of*
CATHARINE MACABEE, *deceased.*

The probate of a will of personalty, is conclusive as to the validity of the will in every case, except in a proceeding instituted for the purpose of revoking, or modifying the probate.

The statute has made no express provision for revoking a probate where another and later will has been discovered: though the power to revoke seems to be implied in the section declaring the force of the probate as evidence, until reversed on appeal, revoked on allegations filed within the year, or "*declared void by a competent tribunal.*'

The power to revoke probate has been exercised by the ecclesiastical courts, whether the will was proved in common or in solemn form. The Surrogate may open a decree of probate for the purpose of taking proof of a later will. This power is incidental to his jurisdiction of the proof of wills, and is essential to the administration of justice.

The Surrogate's Court proceeds in all matters relating to the probate of wills, and the administration of the estates of deceased persons, according to the course of the common and ecclesiastical law, as modified by statutory regulations. Where jurisdiction is given by statute, the mode of exercising it in cases not specially provided for, must be regulated by the court in the exercise of a sound discretion, according to circumstances.

Although a will has been admitted to probate, a legatee under a later will may propound the latter for probate, and is not concluded by the probate of the previous will. If the last will revokes the former, the first decree will be recalled. If the two instruments are not entirely inconsistent with each other, the decree may be so modified as to declare that both instruments, taken together, constitute the last will and testament of the deceased.

Whether it is a sufficient compliance with the statute regulating the manner of executing wills, for one witness to write the name of the other, or for a witness to attest by mark instead of subscribing his name, *quære.*

Where attestation was made, by one witness signing his own name, and holding and guiding the hand of a second witness while the name of the latter was signed,—*Held,* that the execution was valid.

The testatrix requested her will to be altered in the presence of the wit-

nesses; it was altered, read aloud, and executed,—*Held,* that there was sufficient evidence of testamentary declaration.

A. R. Dyett, *for Legatee.*
E. H. Nichols, J. Thompson, W. G. Sterling, *for Executor.*

The Surrogate. The testatrix died on the 14th of May, 1851, leaving surviving her Charles Macabee, her husband, and Charles Logan and Ann Campbell, her brother and sister, and only next of kin. On the sixteenth of May, Charles Logan applied for the proof of a will dated the 8th of May, 1851, wherein he was named executor. All the parties were duly cited, and the will was admitted to probate, without contest, on the 19th of June last. On the 26th of June, James Campbell, the husband of the sister of the deceased, propounded for probate an instrument dated the day after the will of the 8th of May. The parties having appeared on citation, objection was made to any further proceeding, on the ground that the probate of the will of the 8th of May, was conclusive as to the validity of that will. This position is sound and unanswerable in every case except in a proceeding which has for its very object, directly or indirectly, to revoke or modify the probate. If the court possess the power to revoke, open, or alter its orders, it is self-evident that the order itself cannot be set up as a bar to the exercise of an authority which presupposes the existence of some decree or order on which to act. The real question, therefore, is whether after a will is admitted to proof, the Surrogate has control over his own decree of probate. The subject is one of moment, and deserving of much consideration.

The statute has provided the means of enabling the next of kin of a testator, within a year after the probate, on filing allegations against the validity of the will or the competency of its proof, to compel the executors to prove the will anew ; and, after hearing the proofs, if the Surrogate decide the will to be invalid, or not sufficiently proved, he

may annul and revoke the probate thereof. But no provision has been made for revoking the probate, where another and later will is subsequently discovered. And yet such a case may often occur after proof of a previous will, and the parties in interest under the last will be deprived of their rights, without notice and without fault or negligence, unless a remedy exists beyond the express provisions of the statute. There is nothing in the law forbidding the exercise of such a power; but, on the contrary, there is a very fair implication in its favor in the very section which declares the probate to be conclusive evidence of the will until reversed on appeal, or revoked by the Surrogate on allegations filed within a year by the next o kin, "*or the will be declared void by a competent tribunal.*" (2 *R. S., 3d ed., p.* 121, § 21.) This section was proposed by the Revisers as a rule of *evidence* declaratory of the existing law (3 *R. S., 2d ed., p.* 630), and was not designed to restrict the power of the Surrogate. Indeed, it distinctly recognizes the competency of *some* tribunal to declare the will void; and *if that* does not lie within the jurisdiction of the Surrogate, I do not know where the power resides. (*Williams on Exrs.,* 450–457.) No other court possesses jurisdiction in respect to the proof of wills of personal estate; and if the Surrogate has no authority to open a decree for the purpose of correcting a mistake, or to let in the proof of a revocation, or a later will—if the moment a decree of probate is passed, the door is closed, and the act is irrevocable, notwithstanding the discovery of circumstances showing the probate to be erroneous, then it is evident that justice may be sacrificed to the forms of proceeding. This power has always been exercised in the English Ecclesiastical courts. Wentworth says, "If there be falsehood in the proof, were it *communi forma*, that is, without witnesses, or by examination of witnesses, (that is, in solemn form), yet it may in the spiritual court be *undone*, if disproof can be made, or proof of revocation of that will was once made, *or of the making of a later.*" (*Wentworth, Off. Ex.,*

111, 112. *See* 1 *Hagg.*, 241, 645; 3 *Hagg.*, 243; 1 *Phill.*, 83; 3 *Phill.*, 33, 56; 1 *Add.*, 219, 365; 1 *Curt.*, 691; 3 *T. R.*, 125; 4 *Serg. & Raw.*, 201.)

I consider the power now under discussion as essential to the administration of justice and as a necessary incident to the exclusive jurisdiction of the Surrogate over the subject matter of the probate of wills. In this connection my attention has been drawn to the authority exercised by the chancellor acting under the special power conferred on him by the English bankrupt law. Without any provision in the statute for that purpose, he has constantly exercised jurisdiction in recalling certificates and superseding commissions, on the principle that the power is incidental to the jurisdiction, and necessary for the ends of justice. (*Eden on Bankrupt Law*, 412, 431)

But the spiritual courts have always exercised this power over their own decrees; and the Surrogate's Court, though of inferior jurisdiction, being a tribunal proceeding according to the course of the common law, and recognized by the common law, proceeds in all matters relating to the probate of testaments and the administration of the estates of deceased persons in conformity with prescription and established usage, except as modified from time to time by statutory regulations. It is true, the revised statutes define the jurisdiction of the Surrogate, and direct its exercise "in the cases and in the manner prescribed by the statutes of the State" (2 *R. S.*, 3d ed., p. 318, § 1); but the power to take the proof of wills being given generally, the mode of its exercise in a case not provided for by statute, must be regulated by the court in the exercise of a sound discretion according to the peculiar circumstances of each particular case. For example, there can be no doubt that a legatee or party interested in a later will, discovered after a previous will has been admitted to proof, has a right to have the last will proved and letters testamentary issued thereon. But there cannot be two last wills and two sets of letters at the same time. It is incidental,

therefore, to the exercise of jurisdiction in taking probate of the last will, and the consequent grant of letters, to revoke the first probate and the first letters testamentary.

It may not be always necessary to revoke the first decree entirely, unless the effect of the last will is to establish an entire revocation of the first. That depends upon the extent to which the later will modifies, or is inconsistent with, the provisions of the former. And there may be cases, therefore, where, instead of revoking absolutely the first decree of probate, it will be sufficient so to modify it as to declare that both instruments, taken together, constitute the last will and testament of the deceased. Thus, in the present instance, the will of May the 8th, 1851, disposes of the real estate of the testatrix equally between her brother and sister, and, though silent as to the personalty, appoints an executor. The alleged will of the 9th of May, bequeaths the personal estate to Mrs. Campbell; and, if proved, it would require a modification of the previous decree. For, notwithstanding the first will gives no legacies, the appointment of an executor defines its type as a will of personal estate; and, in fact, it was both propounded and admitted to proof as a will of real and personal estate.

Though Mrs. Campbell is the sole legatee, under the will last propounded, she is also a sister of the deceased; and having been duly cited to attend the probate of the will of the 8th of May, and having failed to appear and contest it, it is urged that she is estopped from now propounding a subsequent will. She alleges, in excuse, sickness, failure to consult counsel, and mistake as to the necessity of appearing and producing the will of the 9th of May, growing out of her knowledge that the will of the 8th of May only disposed of the real estate. But the testatrix was a married woman, living separately from her husband, under articles which gave her certain powers over her estate. And it is now urged by her husband that, if she died intestate, a contingency has occurred not provided for by the trust deed, and, as her husband, he will become en-

· CAMPBELL *vs.* LOGAN. ·

titled to her personalty. If this be so, then the citation to Mrs. Campbell, as next of kin, should not conclude her, she having no interest as next of kin. And so, on the other hand, if she was properly cited as next of kin, then she has a right, in the same character, to compel the proof of the will *de novo*, by the executor, within the year; and in that way the paper of the 9th of May could be brought in. She may as well, therefore, attain her object in the mode now adopted, and I shall proceed to consider whether the will of the 9th of May has been duly proved.

It is written on a single sheet of paper, immediately beneath a previous testamentary disposition, bearing date April 28th, 1851. The whole document reads as follows:

NEW YORK, April 28th, 1851.

In the name of God, Amen, I Catharine Macabee, now living in New York, being of sound mind and understanding, do make my last will and testament, as follows: that is to say, I will leave all my household furniture and money to my sister, Anne Campbell, after all the expenses · is paid.

CATHARINE MACABEE,

For the Bowery Savings Bank.

CATHARINE MACABEE.

WILLIAM S. CROOKER,

Witness, SAMPSON CROOKER,

SARAH M. DISNUFF.

May 9th. I now give all my household furniture, and all my money, to my sister, Ann Campbell.

CATHARINE MACABEE,

WILLIAM CROOKER,

SARAH M. DISNUFF.

It appears, in proof, that the name of the testatrix was subscribed to the will by William Crooker, one of the witnesses, he guiding her hand, and she holding the pen. The

same thing occurred as to the subscription of the name of the other witness, Sarah M. Disnuff, who took hold of the pen while Crooker conducted it, and wrote her name. It thus happens that the whole of the instrument dated May 9th, was written by one of the witnesses, the testatrix and the other witness not even having made their marks.

The statute of frauds expressly permitted the signature of the testator to the will to be made by some other person in his presence, and by his express direction. The 9th section of the statute of 1 *Vict. c.* 26, and the act concerning wills, 1 *R. L.*, 364, in terms allowed the same thing. Under these statutes it has been decided that the signature of the testator, or of the witnesses, by making a mark, is sufficient. (*Baker* vs. *Dening*, 8 *A. & E.*, 94; *Wilson* vs. *Beddard*, 12 *Simon*, 28; *Harrison* vs. *Harrison*, 8 *Vesey, Jun.*, 185; *Addy* vs. *Grix, id.*, 504; *Jackson* vs. *Van Dusen*, 5 *John. R.*, 144; *Doe* vs. *Milton*, 7 *Halsted*, 70; *Adams* vs. *Chaplin*, 1 *Hill., South Car. Eq. R.*, 266.)

But (In the goods of John White, 2 *Notes of Cases*, 461) Sir H. Jenner Fust held the execution of the will insufficient, where it appeared that one of the witnesses signed not only his own name, but that of the other witness, his wife, who was present at the time. The judge put the decision on the ground that the statute did not authorize any person to subscribe the witness's name—that the act required both witnesses to subscribe " either by signature or mark." There was no evidence that the wife had, in fact, become a party to the subscription of her name as a witness, in which respect that case differed from the following. In *Harrison* vs. *Elvin*, 3 *Qu. B. R.*, 117, a will made after the statute of 1 *Vic., c.* 26, was attested by one witness, in his own handwriting; and he also held and guided the hand of a second witness; and in this way the name of the second witness was written. This was held a good attestation, the second witness being really a party to the act of signing his name.

Our statute, in prescribing the forms requisite to the due

execution of a will, does not in terms permit the subscription of the testator to be made by another person; but that mode of execution is recognized, by implication, in the section which requires every person "who shall sign the testator's name to any will by his direction," to "write his own name as a witness to the will," under a certain penalty for a failure in that respect. (2 *R. S.*, 3*d ed.*, *p.* 124, § 33.) There is nothing in the statute authorizing one witness to sign the name of another witness. The question is, therefore, brought down to the same point presented in *Harri-son* vs. *Elvin*, that is, whether, by holding the pen while the other witness guided it, the former so became a party to the act of signing, that it may properly be termed his signature, though he was aided by another in making it. Our statute differs from the English act, in requiring each of the witnesses "*to sign his name* as a witness at the end of the will,*" while the latter only prescribes that the witnesses shall "attest" and "subscribe" the will. The will, by our act, is simply required to be "subscribed" by the testator; but each of the witnesses must "*sign his name.*" For the witness merely to put his mark, is not a signature of his *name;* and where witnesses attest by mark, their names are generally written by other persons, without the marksmen taking any part in the act. In such cases, a question may very well arise, whether that mode of execution is sufficient; but, in the present instance, the facts show a physical participation of the witness in the act of signing her name, which I think it reasonable to hold a sufficient compliance with the statutory requirement.

Other objections are made to the probate, which I will proceed to consider. The history of this transaction appears to be as follows: William Crooker, one of the witnesses, was sent for by the testatrix on the 28th of April, 1851. She then dictated the will; he wrote it, read it to her, and she approved it. She then held the pen, the witness signed her name for her; she declared it to be her last will and testament; and the witnesses, at her request, attested it.

On the 8th of May succeeding, the testatrix executed another will, disposing of her real estate equally between her brother and sister, and appointing her brother executor. This instrument was drawn by filling in a printed form of a will, and contains a printed clause revoking all former wills.

This transaction having occurred, William Crooker testifies that the testatrix sent for him again, on the next day, the 9th of May. "She said, there had been a new will made, and it had been read over to her in such a hurry that she did not, scarcely, understand any of it, and she was asked if she would sign it, and she said, ' Oh, yes, she would sign it.' That she did not know what she signed; she was then very sick. She wanted me to alter the will I drew, April 28, to a later date. She wanted all her money, her household furniture, and clothing, to be given to her dear sister Ann. These were her words. She said she was afraid there was some intriguing in relation to the will she spoke of. That will was made, I think, a day or two before the 9th of May. She was afraid it was not as she wanted it. This will, of April 28, was just as she wanted it to be. I asked her about her other property; she said, it was not worth while to say anything about that in her will, because that would naturally fall between her brother and sister. She asked me to draw this will, of May 9th : I did so in her presence. Mrs. Campbell and Mrs. Disnuff were present. After I drew it I read it aloud to her. Mrs. Campbell and Mrs. Disnuff were present when it was read. After it was read I signed it for her, she holding the pen, and I guiding it for her. All I remember she said after signing was, that the writing was sufficient, she was satisfied with it. At the time I read aloud the writing of the 9th of May, I also read aloud the whole of the previous paper. She asked me and Mrs. Disnuff to sign the writing of the 9th of May. I don't recollect she said the paper of the 9th of May was her last will, but she said it was all right. Mrs. Disnuff was present during

all the conversation about the previous will." " When she executed the will of May 9th, I believe she was as sane as she could be. I did not see anything otherways. I, and Mrs. Disnuff signed the will of May 9th, in decedent's presence. Mrs. Disnuff was in the room when I went in. The decedent, on the 9th of May, said that she wished to have her will sent to Mr. Sampson Crooker, for him to sign it, as he was not there: Mrs. Disnuff came for me to my house; she also wanted Mr. Sampson Crooker. The message came to us both; he was not at home."

Mrs. Disnuff testifies substantially to the same facts in regard to the execution of both papers: that they were drawn by Mr. Crooker, as directed by the testatrix, were read aloud,—and also in relation to each instrument, that the testatrix "called it her will." Mrs. Disnuff was very far from being an intelligent witness, and got into some confusion about the will of the 8th of May. But she subsequently recollected herself on that point with more distinctness. She also states, " I went after Mr. Crooker, at Mrs. Macabee's request; she told me to go for him, to ask him to come down and make her will; that was the first time, on the 28th of April. The second, on the 9th of May; she told me to go for him to come down and alter her will. She told me to ask both the Crookers to come ; she wanted both of them to sign. Mr. William Crooker came. She said, when he came, she was very glad to see him. She wanted him to alter her will for her; she said she wanted the date altered." The witness further states, in regard to the will of the 8th of May, that the decedent " after it was executed, sent for Mr. Crooker to alter her will ; she said she thought her brother wanted to cheat her. She fretted about it; she cried about it, before I went for Mr. Crooker."

I think this evidence establishes a substantial declaration by the decedent of the testamentary character of the instrument, at the time of its execution. She declares her intention, in the presence of both the witnesses, to have

the will of April 28 altered, so as to be posterior in date to that of the 8th of May, and gives the instructions herself; it is done in her presence, the whole instrument is read to her aloud, including the paper of the 28th of April, which contains on its face a testamentary declaration; and then she pronounces it correct, and the execution is consummated. Indeed, the object of the transaction was to bring down the will of April 28th to that date; and not to alter its terms, but alter its date,—so that nothing more was designed than a re-execution, which was accomplished by the new writing commencing with the words, "I now give," &c. Independently of all the other circumstances, if there were nothing else than the reading of the whole instrument aloud, and the approval of the testatrix, I think that would be a sufficient testamentary declaration.

I see no reason to give any weight to the suspicions suggested as to the genuineness of the instrument, or the honesty and veracity of the witnesses; and there is sufficient evidence that the testatrix was quite as competent to make a will on the 9th as she was on the 8th of May. Nor is there any satisfactory proof that the will now offered for probate was not in harmony with her wishes and affections otherwise expressed. The design of giving her personal estate to her sister, which existed on the 28th of April, seems to have been adhered to, and in consequence of the execution of the will of the 8th of May, to have been subsequently ratified and confirmed. We have not enough of the circumstances attending the execution of the will of the 8th of May, to judge why the personal estate was not disposed of, in that instrument. And to argue that she did not intend to bequeath her personalty, because, by the terms of the trust deed, she had no right to do so, is to assume a legal proposition, at least disputable. The motives of unlearned persons cannot be very nicely and critically examined on the assumption of their correct comprehension of the precise terms and legal effect of a trust deed like that. Unless the witnesses to the will have

forsworn themselves, she certainly did attempt to will her personalty on the 28th of April, and again on the 9th of May; and against testimony so positive and circumstantial, mere conjecture, however plausible, should not be indulged.

The anxiety of Campbell and his wife, as subsequently evinced, to discover the precise contents of the will of the 8th of May, seems to have subsided, on its appearing that it devised the real estate equally between brother and sister. And though there was some dispute among the parties in the presence of the testatrix, in the course of which the papers of April 28th and May 9th were not mentioned in terms, yet it seems that the dispute was about the will of the 8th of May, and the money of the testatrix, which Campbell claimed belonged to his wife. It is difficult to get a clear idea of what was said on that occasion, and but little if any weight can be attached to a conversation the exact purport of which is doubtful. I cannot infer from it, that Campbell did not set up the wills of the personalty, for it appears that he claimed the money; and that, therefore, Logan asked the testatrix whether the will of the 8th of May was not her last will and testament. Why do this, unless some other will was alleged? I do not, consequently, feel justified in deducing the inference from these conversations, which is sought to be drawn against the *factum* of the papers of April 28, and May 9. As to the answer made at that time by the testatrix, to the question whether the Logan will of the 8th of May was not her last will and testament, the legal effect of her saying "Yes" could not be to revoke the will of the 9th of May. A revocation cannot be established in that manner. As to the bearing of such a declaration upon the question of the *factum* of the paper of 9th of May, there might be something in it, had the testatrix been in a proper condition to comprehend what the altercation was about; but I am far from being satisfied that she was competent at that time. This was on the 12th of May, two days

before her death.   Mr. Jones states that she was " stupid, and had lost her reason mostly."   Dr. Heuxton thinks she " was able to understand all that took place at that time," that " she was not incapable of understanding ; she gave correct answers to other questions ; she was in her right mind ;" though he previously said that " *for several days before her death she was not of sound mind*," and he could not be " certain as to the state of her mind " *on the previous Friday*.   If aroused, it is possible she might have been able to understand a question clearly put to her ; but, even on that supposition, before drawing a conclusion from her answer, it should appear that the matter was distinctly explained.   That does not appear, nor do the witnesses agree with each other as to her mental condition.   The case, therefore, rests mainly on the legal propositions I have already discussed, and on the very explicit evidence of the witnesses, as to the *factum* of these instruments.   I think they are sufficiently proved, and they must be admitted to probate, as, together with the will of the 8th of May, already proved, constituting the last will and testament of the deceased.