In the Matter of the Probate of the Last Will and Testament of PATRICK KEARNEY, Late of the Borough of Brooklyn, Deceased.

EDWARD J. KEARNEY, Appellant ; BRIDGET KEARNEY, Respondent.

*Will — aid given to a testator in signing his will — proof that it was assistance and not control.*

A testator who is physically unable to sign his name to his will may call in another person to aid him in doing so, even to the extent of holding his hand and guiding it. The extent of the aid does not affect the validity of the signature if the signing is in any degree an act of the testator, acquiesced in and adopted by him — the question is whether the aid was assistance or control.

Where a testator has received aid in signing his will, testimony given by a handwriting expert, who compared the signature of the will with two normal signatures of the testator, to the effect that he failed to see " a particle of his (the testator's) handwriting " in the signature, and that, in his opinion, the testator had no superintendence, either mental or physical, in the act, stating as the grounds of his opinion that when two hands are trying to make a signature with two mental conceptions the result is a sprawl and comparative illegibility will not prevail against testimony given by the lawyer who drew the will and by the physician who attended the testator, to the effect that the testator attempted to sign his name without assistance, and that the lawyer, upon seeing the testator's weakness and inability, asked the testator whether he should assist him, and that, upon receiving an affirmative reply, the lawyer took the testator's hand in his own, without touching the pen, and that thereupon the testator, guided by the lawyer, signed his name.

SECOND DEPARTMENT, MARCH TERM, 1902.          [Vol. 69.

APPEAL by Edward J. Kearney, an heir at law and next of kin of Patrick Kearney, deceased, from a decree of the Surrogate's Court of the county of Kings, entered in said Surrogate's Court on the 4th day of February, 1901, admitting to probate an instrument propounded as the last will and testament of Patrick Kearney, deceased.

*Alexander Rosenthal*, for the appellant.

*Francis A. McCloskey*, for the respondent.

JENKS, J.:

At the close of September, 1900, the testator fell ill of the typhoid fever. He made his will on October eleventh, at two o'clock in the morning, and lived for eleven days thereafter. Hypostatic pneumonia manifested itself within a week or ten days of his death, but his physician testifies that he appeared to improve until a short time before it. The testator was sixty-eight years old, and left a widow, but no heirs, except one brother. He made his wife his sole beneficiary. The testator was a former policeman, who owned the house wherein he and his wife lived. It does not appear that he left any other property. The brother, who is the contestant, is a fireman in the service of the city of New York. He attempted to show, mainly by the testimony of experts, *first*, that the subscription of the will was not the act of the testator; and, *second*, that the testator could not have been competent under the physical and mental conditions attendant upon his disease.

*First.* Dr. Welty, the attending physician, says he made a visit to the testator after midnight of October eleventh, which he would have made earlier but for detention; that he found a marked change in the symptoms, especially as to the pulse; that he told the wife of the change, and that then, for the first time, he learned that his patient had not made a will. Thereupon, he fetched Daniel O'Reilly, Esq., a lawyer whom he knew, but who was a stranger to both the patient and his wife. The lawyer drew the will and he and Dr. Welty became the witnesses. Dr. Welty testifies that the pen was in the hand of the testator, who attempted to handle it "without assistance," making one effort, but that "he did not succeed very well," or not at all. The witness saw that the patient was

weak and tremulous, unable to write his name, could not use the pen without assistance, and the witness heard Mr. O'Reilly ask the testator whether he desired Mr. O'Reilly to assist him in writing his name, and the testator answered "yes," whereupon Mr. O'Reilly took the testator's hand and guided it. Mr. O'Reilly testifies that the pen was put in the hand of the testator, who attempted to sign his name, but on seeing testator's weakness and inability, he asked : "Do you wish me to assist you to sign your name?" And upon testator's reply that he did wish it, Mr. O'Reilly took the hand of the testator in his own hand, without touching the pen, and thereupon the testator, guided by Mr. O'Reilly, wrote the signature.

If a testator is physically unable to sign his name, but requires assistance, he may call in another to his aid, even to the holding of his hand and guiding it. The extent of that aid, so long as it is assistance, does not make the signature invalid, if the signing was in any degree an act of the testator, acquiesced in and adopted by him. For in such a case he simply summons outside physical power to supplement his impaired strength. The question whether the signature is the act of the testator does not turn upon the extent of the aid, but whether the aid was assistance or control. If, against the wish of the alleged testator at the time, or without his consciousness as to the purpose, another writes the name with a pen which is merely in physical contact with the hand of the alleged testator, then the signature is not recognized as made by the latter. (*Butler* v. *Benson*, 1 Barb. 526; *Campbell* v. *Logan*, 2 Bradf. 90, 97; *Vandruff* v. *Rinehart*, 29 Penn. St. 232; *Fritz* v. *Turner*, 46 N. J. Eq. 515; *Wilson* v. *Beddard*, 12 Sim. 28; *Den ex dem. Stevens* v. *Vancleve*, 4 Wash. C. C. 262.)

The contestant called an eminent expert in handwriting, who had compared the signature of the will with two normal signatures of the testator. He testified that he failed to see "a particle of his handwriting" in the signature, and that in his opinion, although he would not pretend to say that the testator's hand did not touch the pen, the testator had no superintendence, either mental or physical, in the act. The grounds for his opinion were that when two hands are trying to make a signature with two mental conceptions, they run riot, do not act in unison, and the result is a sprawl and comparative illegibility. If, in seeking to make a joint signature, the

SECOND DEPARTMENT, MARCH TERM, 1902.      [Vol. 69.

testator, possessed of his normal physical force, had sought to write his name in his own way, and Mr. O'Reilly had sought to write that name in his own way, then it may be a fact that the union of these physical forces, in contention natural to the two different fashions of writing the name, could not produce a clear signature. Yet this to my mind does not prove that this testator under the circumstances could not have had "any superintendence, mental or physical," as the witness states. The testator's mental conception that he desired to sign the will may have been entirely clear, and yet his relative physical power, compared with that of the assistant, may have been almost *nil*. His mind may have willed the physical action of signing, and yet his hand may almost have refused to obey his mind, so that when his hand was taken in the hand of a man in good health it may have been almost passive or have yielded almost absolutely to the superior force so as to have lost the power to make its own peculiar letters; yet, so long as there was the conscious wish of the testator that his hand should make the signature, and he participated in any degree in the making of it and acquiesced in and adopted the signature thus made, it was sufficient. Thus, the physical contribution of the testator might be so slight as not to present the condition of two hands trying to make a signature, when each alone was physically capable to make it, and each would strive to make it in its own way. An eminent writer has said that even on questions of handwriting a jury is bound to accept the opinion of an expert employed by a party calling him "as an argument rather than a proof, and to make allowance for all the disturbing influences by which the judgment of the expert may be moved." (1 Whart. Ev. § 722.) And, in this instance, we might well hesitate to accept the conclusions of an expert in handwriting who from such data would seek to state, not a mental condition, but would assert a lack of any mental conception. I think that this testimony of theory should not prevail against the positive testimony of intelligent and comparatively disinterested witnesses that not only the testator directed the terms of his will, but that it was read over to him; that he attempted to sign it unassisted; that only when he failed did he accept an offer of assistance; that he took part in the signing of the will, and that he published it. And, to my mind, the signature as made corroborates the testimony that the testator

attempted to sign the will without assistance. The perpendicular line of the "P" in Patrick is faint and tremulous. This may be assumed to be the first stroke of the first letter that the testator would make. The rest of that letter and the following "a" of the name are more tremulous and more uncertain than the remainder of the name. This would indicate not only an attempt unassisted, but also that the assistant did not aid at first as much as he did later. This, in other words, would tend to show that the participation of Mr. O'Reilly was assistance and not control, and that the aid given was measured by the weakness of the testator.

*Second.* The contestant also called a medical expert who testified as to the character of the disease of the testator and of its effect upon the subject. He did not answer a hypothetical question, but he testified that he had heard the evidence, which at that stage consisted of the testimony of Dr. Welty and of several lay witnesses who had at times visited the testator. Upon such foundation he was permitted, without objection, to give his opinion that a man at the time of the execution of the will would not have testamentary capacity. Another medical expert, in answer to a hypothetical question, agreed with his brother physician. He admitted that if there were no delirium the testator would be competent, but said that in view of the time of the history of the disease, and of the temperature of the patient, delirium must have existed. Opposed to these experts is the testimony of Dr. Welty and the consulting physician, Dr. Ford. The former testifies that at the time the will was executed the mental condition of the testator was good; that he responded favorably to the suggestion that he had better make a will; that he named without any suggestion his wife as a beneficiary, saying "My wife, who else?" (which was in effect a rejection that any other could be considered); that the testator's mind was very clear for a man under the circumstances, and that he seemed to be of sound mind and memory, without sign of mental aberration. As seen, the patient was not *in extremis,* for he rallied and lived for eleven days thereafter. Mr. O'Reilly testifies that in answer to questions the testator expressed a wish to make a will, named his wife as sole beneficiary, said moreover, in answer to a specific question, that he wished to provide for none other, and further testifies that the will was then prepared by him as directed, read over to

SECOND DEPARTMENT, MARCH TERM, 1902. [Vol. 69.

the testator, then subscribed as detailed, and thereupon published. Mr. O'Reilly says that he assuredly considered the testator competent and not coerced. Dr. Ford visited the testator on the day the will was made, and to his best recollection (which was strengthened by the incident of meeting Mr. O'Reilly) also on the following morning. He did not observe coma or delirium or lack of understanding or impaired mentality, until the day before death. On the contrary, the testator's mind was particularly clear when the testator talked to him. Dr. Ford took issue with the experts, or at least contended that their conclusions were not applicable on account of the specific facts in the case of this patient. The nurse corroborates the attendant physicians and Mr. O'Reilly, in that she testifies that her patient was " capable of answering," and though weak, was "not delirious" when Mr. O'Reilly came to draw the will. She left the room just before the will was made. She considered the patient " perfectly sensible."

The testimony of the contestant and of the contestant's son, and of others who visited him as to his listlessness or state of apparent indifference, and his refusal to talk with them, may be fully explained by the fact, which they observed, of his suffering. These facts are not necessarily inconsistent with an ability to rouse and to address himself to the important matter of making his will. I find no evidence of undue influence, and surely the provision made for his wife to the exclusion only of a full-grown man, with assured income about as great as that enjoyed by the testator when in active life, does not lend any force to the contention of the contestant.

The decree of the Surrogate's Court should be affirmed, with costs.

All concurred.

Decree of the Surrogate's Court of Kings county affirmed, with costs.