NEW YORK COUNTY.— HON. D. C. CALVIN, SURROGATE.—
November, 1877.

## MAIRS v. FREEMAN.

*In the matter of the probate of the last will and
testament of JAMES MAIRS, deceased.*

When a will is contested on the ground that a subsequent will was
executed by the testator, the burden is on the contestant to show the
due execution of the subsequent will, in order to establish a revocation
of the one propounded.

Evidence that a daughter of the testator, who was the chief beneficiary
under his will, had, upon several occasions prior to its execution, said
to him that if he made a will, it would be a shame to leave his son. one
of the members of the testator's family omitted from its provisions,
anything,— *Held*, no proof of undue influence, if it be assumed that the
testator was of sound mind.

Where there was an absence of proof showing the exercise of an active
influence by any of the principal beneficiaries under a will, upon the
testator, or any participation on their part in procuring the will to be
made, and the testator survived three years after its execution, stated
that he had made it, and delivered it in person to an executor for safe
keeping.— *Held*, that proof that they occupied the same residence with
the testator, and the fact that the will discriminated in their favor, and
against other of his children and grandchildren, was insufficient to
establish undue influence, assuming that he was of sound mind.

Upon the question of the sufficient execution of the will. the attestation
clause showed that the statutory requirements had been complied with,
and the witnesses, upon their direct examination, testified to the
requisite facts. but, upon cross-examination, omitted the facts that
the testator declared the instrument to be his will, and requested them
to sign as witnesses thereto, and the ink with which one of them
signed, differed from that used in the other signatures. *Held*, that the
whole evidence was to be taken together, and so taken made out a due
execution.*

---

*In ODELL v. LUDLUM (N. Y. County — Hon. D. C. CALVIN, Surrogate
— October, 1877), the evidence in regard to the execution of a will, signed
in a foreign country, was that a servant of the testator summoned one of the
witnesses for the purpose of acting as such; that both the witnesses were in
the presence and hearing of the testator while he gave instructions for, and
signed the will, and afterward, in his presence and each other's, signed as

In support of the claim that the testator was of unsound mind, the con-
testants showed that he had, in the will, mistaken the order in which
two of his daughters were born, had mentioned two adopted children
of a son and a daughter respectively, as his grandchildren, had stated
his own age as 75 when it really was 77, had neglected to provide for
certain grandchildren, one of whom was the son of the testator's
deceased's child, and they also introduced evidence of the testator's
being afflicted with Bright's disease of the kidneys, and other diseases,
during the last years of his life, and two years after executing his will.
*Held,* in the absence of direct proof of the testator's mental unsound-
ness, to be counterbalanced by direct evidence of his vigor of mind
before, at the time of, and after the execution of his will, together with
the fact that he drew the instructions for, and corrected the draft of,
his will, with his own hand.

THE will in question was propounded by Pliny
Freeman and Edward R. Linnemore, executors, and
bore date January 6, 1873, and was attested by War-
ren S. Wilkie and John C. Lang. The points raised
by the learned counsel for the contestants were:

*First,* that the evidence showed the destruction of
a later will, by a person named in the instrument pro-
pounded as a beneficiary, and after testator's death.

*Second,* that the will propounded was executed
under undue influence.

*Third,* that the requirements of the statute had
not been complied with, because the witnesses were
not requested to subscribe as such.

*Fourth,* that there was no publication of the instru-
ment.

*Fifth,* that decedent was of unsound mind.

witnesses, the one summoned by the servant signing at the request of the
notary who drew the will, and the other at the testator's request; that it
was read aloud by the notary in the hearing of the witnesses and of the
testator before being signed; and the allegations in the will recited that the
testator declared and confirmed it, article by article, in the presence of the
witnesses, though their testimony did not show this. *Held,* that the proof
of due execution, under the New York statute, was sufficient.

The facts appear in the opinion.

RICHARD BUSTEED *and* A. H. WAGNER, *for the contestants.*

ROE & MACKLIN, *for the executors.*

THE SURROGATE.—The testimony upon which the first point raised by the contestant is based, was given by Mrs. Wortman, as follows:

" Mrs. Houghton said she found some papers that had some presents and gifts' from her father to Mrs. Dows, and burned them." It also appears that she found the papers in her father's drawer, and that Mrs. Dows was a niece of the deceased. No other description of the papers, is given; whether they were loose memoranda or drawn up in the form of a deed or will does not appear, or whether they bore the signature of the deceased, does not appear; and however reprehensible the destruction of such papers may have been, yet there is no evidence that there was any instrument executed as a *will*, much less that it was executed subsequent to the instrument propounded, so as to produce a revocation of this. When it is alleged that a subsequent will to that propounded has been executed, the burden of proof is with the party alleging it, and he is required, to show the due execution of that instrument, in order that it may constitute a revocation.

As to the contestant's point that the will in question was the result of undue influence, that allegation, upon the assumption that the deceased was of sound mind when he executed the will, is based upon the testimony of Mrs. Wortman that on several occasions. she heard her sister Sarah say to the deceased that it

would be a shame to leave her brother Charles anything if he made a will, and in what is denominated the inofficious character of the will, connected with the fact that the daughters who received a larger proportion of the estate for themselves and their children, had occupied the house and resided with deceased, and that the will discriminated against Mrs. Wortman and her children and against the deceased's son, Charles, and his grandson, Charles Edwin, son of a deceased son, in favor of Mrs. Merrill, and the children, natural or adopted, of Mrs. Skinner and Mrs. Houghton.

As to the first suggestion, that Mrs. Houghton expressed the opinion to her father that it would be a shame to give his son Charles anything by his will, there is nothing in that which amounts to, or tends to prove undue influence.

In Gardiner v. Gardiner ( 34 *N. Y.*, 155,) it is held that undue influence must not be such as arises from influences of gratitude, affection, or esteem, but it must be the control of another will over that of the testator, whose faculties have been so impaired as to submit to the control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will.

It is held in Blanchard v. Nestle (3 *Den.*, 37), and Seguine v. Seguine (3 *Keyes*, 663), that the undue influence exercised by coercion, imposition, or fraud, and its exertion upon every act, must be proved; it will not be inferred by opportunity and interest.

In McMahon v. Ryan (20 *Penn. St.*, 329,) it is held that duress or undue influence must be a present

constraint operating upon the mind of the testator in the very act of making the testament. (See also Fagan *v.* Dugan, 2 *Redf.*, 341; Kinne *v.* Johnson, 60 *Barb.*, 69; Van Hanswych *v.* Weise, 44 *Barb.*, 494; Wade *v.* Holbrook, 2 *Redf.*, 378.)

*Redfield on Wills* (vol. 1, p. 525), after a very exhaustive consideration of the authorities upon this subject, states, as the result, that the influence to avoid a will must be such as —

*First*, to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others than of his own.

*Second*, that it must be an influence specially directed towards the object of procuring a will in favor of particular parties.

*Third*, if any degree of free agency or capacity remained in the testator, so that when left to himself he was capable of making a valid will, then the influence which so controls him as to render his making a will of no effect, must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty, and it must have proved successful to some extent, certainly.

In Elliott's Will (2 *J. J. Marshall*, 340); Miller *v.* Miller (3 *Serg. and Rawle*, 267); and Moritz *v.* Brough (16 *Id.*, 403), it was held substantially that the influence of a child, or wife, or of a friend, if exerted in a fair and reasonable manner, and without deception or imposition upon the testator, while he had capacity to deliberate and estimate the inducements offered, will not avoid a will in favor of such party.

There is, in this case, an entire absence of proof

showing any active influence by the beneficiaries in this will upon the testator, or any participation in procuring the will to be made, and if undue influence can be made out in this case, it must be based exclusively upon the mere fact of the opportunity which was afforded the beneficiaries to attempt to exercise undue influence, and from the unequal provisions of the instrument itself.

*Redfield on Wills* (vol. 1, p. 516,) says: "So where a will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, this of itself will impose upon those claiming under the instrument the necessity of giving some reasonable explanation of the unnatural character of the will, or, at least, of showing that its character is not the offspring of mental defect, obliquity, or perversion." (See also Clark *v.* Fischer, 1 *Paige*, 171.) But in the latter case there was positive evidence that the relatives of the deceased commenced a system of intrigue and management for the purpose of getting the control of the personal property of the testator, who was bedridden — a paralyzed old man. His niece, who was in the habit of visiting him, was excluded from the house, and means taken to prejudice the testator against her. He was persuaded to marry again; he was prepared to make his will; and after the death of a brother, the widow procured from the almshouse a child, which was imposed upon the testator as his niece. By will he gave one-fourth of his property to the suppositious niece, the residue to his wife for life, with power to her and the co-executor to sell and dispose of it. The

Chancellor found these facts, and reversed the decree of the Surrogate admitting the will to probate.

Redfield (p. 522), after announcing the principle that if a will be what is denominated an undutiful testament, unjust to children or others entitled to the estate, indicating an act of caprice, over-persuasion, or deception, it must certainly excite apprehension of undue influence, says: "But it is not to be supposed that the courts would adopt any such view of the law as virtually to deprive the testator of the right of disinheriting his children, even upon any ground satisfactory to himself;" and (at page 526) the same learned author says: "Although the fact that the testator makes a will in favor of one not a relation may be suspicious, nevertheless affirmative proof of undue influence will be required to invalidate it." (See Jenckes v. Court of Probate (2 R. I., 255.)

In Ross v. Christman (2 Redf. Cases on Wills, 297,) it is held that where capacity, formal execution, and volition all appear, no tribunal can pronounce against the will, because of disapprobation, however strong it may be, of the dispositions made by the testator.

In Pool v. Pool (35 Ala., 12,) it was held that no legal presumption of undue influence arises from the facts that the testator was of weak mind, addicted to drink, and nigh unto death, and that he was surrounded by those principally benefited by the provisions of the will, while his relatives were away, and the provisions of the will were unnatural, and though the jury might find the facts, it was for the Court to pass upon the undue influence.

In Dean v. Negley (41 Penn. St., 312,) Chief Justice

Lowry says: "The will of a man who has testamentary capacity cannot be avoided merely because it is unaccountably contrary to common sense of the country. His will, if not contrary to law, stands for the law of descent of his property, whether his reasons be good or bad, if indeed they be his own, uninduced by unlawful influence from others."

Redfield, in his treatise above cited (p. 526), says: "It must always have considerable weight in favor of the validity of a will where the testator lived many years after its execution, and was confessedly relieved from the influence of the alleged infirmity of mind, or defect of freedom, by which it is attempted to be set aside without making any alteration in, or revoking the same. For it is always the proper enquiry, in regard to undue influence, whether it appeared as part of the transaction of making the will in question. And as that is an act always ambulatory, during the life of the testator, his conduct after its execution is entitled to some weight in determining its validity."

In the case of Earl Sefton *v.* Hopwood (1 *Foster and Fin.*, 578,) it was held that supposing a will to be made by a person of testamentary capacity, it is not sufficient to avoid it that it is not such a will as a reasonable person would make, or that it is harsh, capricious, or unjust, nor, on the other hand, is it sufficient to avoid it on the ground of undue influence, that it was made as the result of acts of attention and kindness.

In Seguine *v.* Seguine (3 *Keyes*, 663,) it is held that the doctrine of an inofficious testament has no place in our law; that if a testator has full testamentary

capacity, and be under no undue influence, he may dispose of his property by will as he pleases, however absurd or unjust the dispositions may be, and in Deas v. Wandell (1 *Hun*, 120), affirmed in the Court of Appeals (59 *N. Y.*, 636), it was decided that the mere fact that the will gives all the property to persons not related to the testator, does not raise an inference of want of mental capacity, or of undue influence.

It is undoubtedly true, as stated in Harvey v. Sullens (46 *Mo.*, 147), that the presumption is against the propriety of a transaction where a devise is made to a stranger, at the expense of the natural heirs, and that the onus of establishing the devise to him to have been voluntary, and to have been well understood, rests upon the party claiming, and that the nature of the transaction requires clear evidence that it was the deliberate offspring of the testator's own judgment. But in this case the consideration of this question has been made upon the assumption of the soundness of mind of the testator, and the facts, that he made a draft of the will, so-called, stating the various provisions in his own handwriting, and delivered them to his agent to procure the will drawn, that the draft was subsequently submitted to him, and he examined it, and afterwards executed an engrossed will in the presence of disinterested witnesses, that this will was not in any way procured by the interference of either of the beneficiaries, and all this was done in the absence of all of the beneficiaries, that he survived three years thereafter, and stated that he had made his will, and delivered it in person to one of the executors for safe keeping,--are facts which, to my mind, entirely

overcome any presumption to be derived from the so-called unjust provisions of the will in question.

In McLaughlin v. McDevitt (63 *N. Y.*, 213,) Church, C. J., (p. 219) says: "Counsel for proponents of the codicil strenuously urged that neither fraud or undue influence had been proved, and cited various authorities to establish the proposition that when testamentary capacity and the execution of the instrument are proved, it should be admitted to probate, unless facts were shown to make a case of fraud, or undue influence within ·the· established definition;" and while the learned Chief Justice seems to acquiesce in the force of these authorities, he proceeds to show that in that case there was evidence of an attempted fraud, and of undue influence, by one of the beneficiaries in procuring the execution of the codicil in question.

In Hazard v. Hefford (2 *Hun*, 445,) Gilbert, J., says: "There may be, perhaps, occasion to suspect that the father of the principal beneficiary exerted some influence in procuring some of the obnoxious provisions to be inserted in the will; there is not proof of such influence. If·that fact were proved, it would not invalidate the will," and (p. 446) he says: "Evidence that testatrix had been influenced in making the will, would lead to no legal result. Such an enquiry would lead to an investigation of the motives and the reasons operating on the mind of the testatrix would end only in confusion and doubt. It is therefore a wise and salutary rule that requires proof of actual coercion or fraud."

In Rollwagen v. Rollwagen (3 *Hun*, 121,) it was

held that in a case where deceased, shortly before his death — helpless, dependent, and naturally subject to the influence of his wife — made, under her direction and procurement, certain changes in a will formerly executed by him, all of which would enure to her benefit, the presumption was that they resulted from her influence, unduly and improperly exercised over him; but in that case, the helpless, dependent condition of the testator was actually proved, as well as the subjection to the influence of his wife, and the actual procurement by her of the making of the instrument.

I have now reached the third point raised by contestant's counsel, which is that the witnesses were not requested to sign their names as witnesses, and that the deceased did not declare the instrument subscribed by him to be his last will and testament. The testimony bearing on that question is as follows: Mr. Wilkie, one of the subscribing witnesses, testified that the deceased spoke to him about having a will drawn; he said he would bring Mr. Lang to attend to it; that at the time of its execution he saw deceased sign the instrument, when he said it was his last will and testament, and that Mr. Lang and himself were present, and signed as subscribing witnesses, because deceased asked them to.

On cross-examination, this witness testified that he attended as a witness, at the request of the deceased; that he and the witness Lang went to deceased's office; that the first thing done after they reached the office was, Mr. Lang handed the doctor (the testator) the will to read; that it was read and signed; that he

didn't remember any remark by the doctor, except something — the way the will was drawn as it was; that the draft instructions were in the handwriting of deceased, which was handed to witness by the doctor; that a copy was made by Mr. Lang, and he and witness went to deceased and read it to him.

The other witness, Lang, who drew the will, testified that the draft was delivered to him by the witness Wilkie, from which he drew the draft and attended at the doctor's office, where he met Mr. Wilkie; submitted his draft to the doctor, who read it over, made some alterations, after which he had an engrossed copy, and made an appointment at the doctor's house, when the will was read by the doctor, who said it was right, subscribed his name to it, and the witnesses signed; he believed he asked deceased if he requested them to sign as witnesses, and he seemed to be satisfied, and they signed; that after he signed, witness enquired who he wanted to witness the will, and deceased said witness and Wilkie; that witness then read to decedent the attestation clause, and the decedent was satisfied that Wilkie and he should subscribe as witnesses.

Lang, on being recalled for cross-examination, testified that the draft delivered to him by Wilkie was in the handwriting of the deceased; that he went carefully over the paper with deceased, and received an explanation from him; that he afterwards drew up a draft; saw the deceased, and asked him who he wanted for executors, and he told him; he had another interview with him at his office, and submitted a copy or draft to him; and thought the

doctor read it himself carefully over, and made some alterations.

It is true that both of these witnesses, on cross-examination, disconnected with their direct examination, failed to show the due execution of the will; but they evidently made the common mistake of testifying on cross-examination, assuming that what they have testified on direct examination stands as evidence in the case, and did not need to be repeated. This omission on the part of Lang, as an attorney, is certainly not very creditable to his intelligence, but I am of the opinion that the whole testimony should be taken together, and from that, under the authorities, I entertain no doubt of its due execution.

In Brinckerhoof *v.* Remsen (8 *Paige*, 488,) the Chancellor (at page 498) says: "I think there can be no reasonable doubt that if this will and attestation clause had been read over in the presence and hearing of the testatrix, or that the witnesses could be fully satisfied that she knew its meaning, that the request to them to attest it as a witness would have been such a recognition of the instrument as her will as to make it an execution thereof, according to the spirit and intent of the statute."

In Forman's Will (1 *Tuck.*, 205,) one of the witnesses, in the room where the will was executed, was told by the deceased that the instrument was her will; the other witness was only asked by the decedent, while in another room, to come in and witness her will. This was held sufficient, together with proof that deceased signed in the presence of both witnesses.

13

In Gilbert *v.* Knox (52 *N. Y.*, 125,) the will was subscribed in the presence of the witnesses, when one of the witnesses stated to decedent that it was necessary that he should request the witnesses to sign his will as such, and said: "That is Mr. Knox's will, and he wishes us to sign it as witnesses;" this was said after the will was signed, in the presence of the testator and the witnesses, but the testator made no reply, and witness testified that he had no doubt the testator heard him. The Surrogate refused probate for want of valid publication, but the court on appeal reversed his decree, holding that the publication was valid, as the witness had charge of the execution and assumed to speak for the testator. Andrews, J., (p. 130) says: "The circumstances show the testator intended to make a valid execution of the will, and the witness signed it at his request, within the case of Peck *v.* Cary (27 *N. Y.*, 9)."

In Campbell *v.* Logan (2 *Bradf.*, 98,) the will was held to be properly published where it was read to the testatrix, signed by her, she saying that the writing was sufficient, and asking witness to sign it, though neither of the witnesses could remember that she declared it to be her last will.

In Moore *v.* Moore (2 *Bradf.*, 265,) Surrogate Bradford said: "No particular form is requisite; all the law requires is that the testator shall communicate to the witnesses that it is his will; that he desires them to attest it. This can be done by reading, or other acts performed by a third person, provided an intelligent assent on the part of the testator be shown."

In Vaughan *v.* Burfoot (3 *Bradf.*, 78,) it was held

that the reading aloud, followed by the act of signature, constituted a testamentary declaration.

In Thompson v. Stevens (62 *N. Y.*, 634), there was the usual attestation clause subscribed by witnesses; the will was drawn at testatrix' request, she giving instructions; it was read to her in the presence of one witness. It was held that the evidence showed a sufficient declaration.

In Peck v. Cary (27 *N. Y.*, 9,) it was held that the witnesses subscribed at the request of the testator, upon evidence that the draftsman stated to the testator the necessity of having witnesses, and upon enquiry as to who could be obtained, called upon three persons who were within sight and hearing, and requested them to witness the testator's will, the paper then lying upon the table, near which the draftsman and testator stood, and stated in the hearing of all that deceased was going to sea, and was making his will, and he wished them to witness it.

In Nelson v. McGiffert (3 *Barb. Ch.*, 158,) the Chancellor said: "Not only the witnesses, but the testator himself, must have understood that they were witnessing the execution of the will, in conformity with his desire and wish, although he may not have said in terms, 'I request you, and each of you, to subscribe your names to this my will.'"

In Coffin v. Coffin (23 *N. Y.*, 9), one of the witnesses, in presence of the other, whose attendance was procured by the testator, asked him: "Do you request me to sign this as your will, as a witness?" He answered, "Yes." It was held a sufficient request to both, and a publication of the will.

In Stewart's Will (2 *Redf.*, 77,) it was held that reading of the attestation clause in testator's presence, even after it had been signed by the witnesses, was sufficient evidence of the testator's request to sign, recited in it.

In Burke's Will (2 *Redf.*, 239), and Neugent *v.* Neugent (*Id.*, 369), this question will be found discussed on authority, and from such examination as I have been able to give the subject, I entertain no doubt of the due execution of the instrument in question as a last will and testament.

Taking all the evidence together — the different instructions made by the deceased, his request to Wilkie to procure his will to be drawn, his reading and correcting the draft made by Lang, his request to Lang and Wilkie to attend for the purpose of the execution of the will, and as witnesses, his reading of the instrument executed, together with the fact that the attestation clause contains a recitation of the statutory requirements — all satisfy me that the deceased well understood that he was executing a will, as the witnesses did; and while there is some confusion in the testimony of the two subscribing witnesses as to what was done, particularly in their cross-examination, and the ink used in signing by the witness Wilkie was dissimilar to that used in writing the will, and unlike the " 75 " written for the age of decedent, and the signature of the deceased and the other witness (Lang) is claimed to be an indication that the signature of Wilkie could not have been made at the time the deceased and the witness Lang subscribed; yet as both the subscribing witnesses

appear to be indifferent, and the witness Lang is an attorney, knowing that it was necessary that the witness Wilkie should see the deceased sign, and that the two should be present at the same time, and the fact is established by the due recitation of the attesting clause, together with the force of the certificate by the witnesses, I entertain no doubt that the witnesses truly testified that the execution was in the presence of both of the witnesses.

Considerable was said in this case as to the word " adopted," on the margin of the will opposite to " Frank Houghton, son of Mary Houghton," which, if a part of the will, would have designated him as an adopted son of Mary Houghton. The word is in pencil, and the proof is quite conclusive that it has been inserted since the execution of the will, and since the decease of the testator, the fact, however, being, in respect to Frank Houghton, that he had been taken by Mrs. Houghton from one of the public institutions of the city, and treated as a son; but I am entirely unable to perceive any effect that can be given to this marginal word, " adopted," so far as the will is concerned.

In Tonnele's Will (5 *Leg. Obs.*, 254,) it was held that an immaterial interlineation in pencil, in the handwriting of the executor, would not affect the execution of the will.

There is no difficulty in understanding who the testator meant by " Frank Houghton, son of his daughter, Mary Houghton," nor does it in any way affect the bequest by assuming that the word " adopted " was written by the deceased himself. It would not change

the description, or the direction of the legacy, and it therefore seems to be entirely immaterial.

The next and final question involved in this probate relates to the mental capacity of the testator when he executed the instrument in question, which is, to my mind, the most embarrassing. In determining this question, it is important, first, to settle the rule as to what constitutes testamentary capacity. That capacity seems to be clearly defined by Davies, J., in Delafield *v.* Parish (25 *N. Y.*, 9), which has been since recognized as expressing a settled rule upon the subject. He says: "We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relation to persons who were, or should, or might have been objects of his bounty, and the scope, and bearing, and provisions of his will. He must, in the language of the law, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, to hold them in his mind a sufficient length of time to perceive, at least, their obvious relation to each other, and be able to form some rational judgment in relation to them." (To the same effect see Van Guysling *v.* Furman, 35 *N. Y.*, 70; Kinne *v.* Johnson, 60 *Barb.*, 69; Watson *v.* Donnelly, 28 *Id.*, 653; Ean *v.* Snyder, 46 *Id.*, 230; Reynolds *v.* Root, 62 *Id.*, 250; Rollwagen *v.* Rollwagen, 3 *Hun.*, 121.)

In Bundy *v.* McKnight (48 *Ind.*, 502,) the principle seems to be most clearly and satisfactorily settled, as follows: "The law does not undertake to measure a person's intellect, and define the exact quality of mind

and memory a testator must possess to authorize him to make a will, yet it does require him to possess a mind to know the extent and value of his property, the number and names of the persons who are natural objects of his bounty, their deserts in reference to their conduct and treatment towards him, their capacity and necessity; that he shall have sufficient active memory to retain all these facts in his mind long enough to have his will prepared and executed, and if this amount of mental capacity is somewhat obscured or clouded, still the will may be sustained. (See also Stancell *v.* Kenan, 33 *Ga.*, 56.)

In Forman's Will (54 *Barb.*, 274), mind and memory, as used in our statute relating to wills, are declared to be convertible terms, and the question in respect to testamentary capacity is said practically, in most cases, had the testator at the time, a mind and memory sufficiently sound to make the will in question? Neither age nor weakness of intellect are sufficient to incapacitate a person to make a will. It must be an entire loss of intellect, so that the testator is unable to understand what he is doing, or the contents of the paper when read to him. (Crolius *v.* Stark, 64 *Barb.*, 112.) The claim on the part of the contestants, that the testator was of unsound mind and memory at the time the will propounded was executed, is based on the mistaken order of naming his second and third daughters, on his neglect to provide for Mrs. Wortman's daughter, his granddaughters, and Frank Edwin Mairs, the son of his deceased son; also on the effect of the inequality of the legacies, and the impaired intellect of the deceased growing out of his physical

diseases, but principally upon his alleged affliction with Bright's disease of the kidneys, and the testimony of several experts in answer to the hypothetical question propounded to them.

Dr. Waster, in his testimony, regards Bright's disase of the kidneys as the principal cause named in the question of the unsoundness of mind, though he testified that rheumatism is sometimes produced by urea.

Dr. Conway — though he had answered to a hypothetical question that the deceased was of unsound mind — testified that he didn't know that Bright's disease, rheumatism, and pneumonia would have any special result on the mind, or effect upon the memory. On cross-examination he testified that Bright's disease was the chief thing upon which he based his opinion of unsoundness.

Dr. Dowling answered that he should not consider deceased's mind or memory perfectly sound, and gave an instance where a patient had had Bright's disease, suffering for several years without any apparent effect upon his mind, and that the effect of that disease on the mind depends upon other conditions which result from that disease. On cross-examination he testified that he had known persons suffering for years with that disease, well advanced in years, until the time of their death, with faculties unimpaired, and that there were periods in Bright's disease when a patient would be perfectly incompetent, and others, perfectly competent, and he would account for the alleged loss of memory by his having Bright's disease.

Dr. Healy did not define the special reasons why he thought the deceased was of unsound mind.

Dr. Sayre instanced the case of John Morrissey, who had had that disease for several years, and said that it usually has a serious effect on the memory, but the mind may recover on recovery from the disease; that he was particularly influenced in his answer by the statement that deceased had Bright's disease of the kidneys, and by his forgetfulness; that the mixing up different children showed want of memory, but a person in that condition might attend to business, and might not show his defects to his intimate friends; and that he thought the deceased was unsound in mind, without regard to his disease.

Dr. Freligh testified that he knew the deceased, and was in the habit of consultation with him in his cases, but was not consulted in reference to his own case until within the last year of his life, and that from November, 1872, to his death, he never saw anything to lead him to suspect unsoundness of mind; that the effect of Bright's disease is not uniform on the mind; that it occasionally affects the memory; sometimes produces insanity, but that is not even general; that if deceased had Bright's disease for five years before his death, it would at times affect his mind, and at other times he would be perfectly sane, but that it is a case likely to affect the mind where dropsy supervenes.

This witness was recalled, and the hypothetical question propounded to him, and he testified that a person insane from Bright's disease of the kidneys would be very likely to show it.

Dr. Ball testified that he had been for many years intimately acquainted with the deceased, and attended

him in his last illness; that he was suffering from bronchitis just before he went to the West Indies; didn't think he was suffering from Bright's disease of the kidneys at that time; that he never had the slightest impression of any impairment of deceased's mental powers; that he might have rheumatism, bronchitis, and Bright's disease of the kidneys, and yet his mental condition be perfect; that just before he went South, in 1873, he was remarkably vigorous in attending to his profession, though his health was not good. After the hypothetical question was propounded to this witness, he answered that the first history given in regard to the mistake he made as to his family, would be very conclusive of aberration of mind; that he might forget his age, without being seriously deranged; that he did not think that want of recollection was proof of unsoundness of mind.

Dr. Freeman testified he was a partner with deceased for eighteen years, to 1871; occasionally saw him after that. On cross-examination he testified that he didn't think his ill health affected his intellect at all before he went to the West Indies; that he didn't think his want of memory interfered with his judgment.

The only testimony tending to show the deceased was afflicted with Bright's disease of the kidneys at the time the will was made, is that of Mrs. Wortman, which was, in substance, that Dr. Freeman was his physician, who attended him; that she had seen Dr. Freeman at his house in this city since her father's death, and conversed with him upon the subject of the will; that in the interview something occurred in

respect to her father's condition of health prior to his death.   Then this question was propounded.

Q.   " Do you know, or are you able to tell, the various diseases from which your father suffered before his death ?

A.   " I can state what I have heard physicians say.

Q.   " In your father's presence, or when they were there to attend upon him ?

A.   " When they were there attending upon him.

Q.   " Of the disease ?

A.   " Yes.

Q.   " State, if you please, what you heard the physicians say.

A.   " He was troubled with rheumatism, dropsy, Bright's disease of the kidneys, and several other diseases."

This clearly relates to the Doctor's last illness, which covers the last year of his life, and does not alone, it seems to me, justify the allegation that he was suffering from Bright's disease of the kidneys at the time when the instrument was executed, propounded as his will, and taken with the testimony of the doctors, Ball and Freeman, together with the testimony of the other witnesses as to his condition of health, entirely fails to show a just basis for the insertion of that disease in the hypothetical question propounded to all the physicians, and hence, as I have already shown, the answers of the several physicians to the hypothetical question seems to me to shed no light upon the real question at issue, which is the mental condition of the testator at the time when he executed his will.   And, while upon this question, it

is perhaps proper to remark that the expert testimony based upon the hypothetical question, without having read the whole testimony, and without personal knowledge of the case, and of the deceased, is quite unsatisfactory, unless otherwise verified; yet, upon the assumption that the experts are disinterested and wholly impartial, it is very difficult to determine the condition of a person's mind from a few independent and isolated facts as to the peculiarities and eccentricities of a patient, where the general conduct does not fill up the gaps between the particular alleged peculiarities.

But, aside from these considerations, it is occasion of unfeigned regret that in practice the testimony of experts has become very unsatisfactory, and often greatly biassed. I cannot better express the result of my experience upon this subject than to quote the language of the learned judge and commentator, Redfield (1 *Redf. on Wills,* 104):

" Experience has shown, both here and in England, that they (medical experts) differ quite widely in their inferences and opinions, as do other witnesses. That has become so uniform a result with medical experts of late, that they are becoming to be regarded much in the light of hired advocates, and their testimony as nothing more than a studied argument in favor of the side for which they have been called. So uniformly has this proved true in our limited experience that it would excite scarcely less surprise to find an expert called by one side testifying in any particular in favor of the other side, than to find counsel upon either side arguing against their clients in favor of their antagonists."

But it is refreshing to find in this case that the expert testimony based upon the hypothetical question propounded, substantially agrees.

So far as the testimony of Dr. Sayre, that the evidences of forgetfulness stated in the hypothetical question, irrespective of any disease, show unsoundness of mind, is concerned, the testimony of Doctors Ball, Freeligh, and Freeman, with that of Worl, the executor Freeman, and Mairs, to the effect that the deceased not only at the time of the execution of the will, and just prior thereto, but subsequently, to the time of his death, gave no evidence of impairment of mind, sufficiently overcomes that testimony, and leaves the question to be determined substantially upon the evidence which is furnished by the terms of the will itself.

As the testimony that Mrs. Teneycke, a sister of the deceased, was insane, was neutralized by the fact that the insanity was the result of paralysis, and the forgetfulness by the deceased of Mrs. Wortman's daughter, two or three years after she is claimed to have been an inmate of his house, is not at all surprising under the circumstances of the case, nor his failure to recognize Mrs. Wortman when she called at the office, as stated by her, on several occasions, for she states on her cross-examination that she did not think anything of that, and that it was after he went to the West Indies, and therefore after the will was executed.

If a testator of sound mind, under no undue influence, may dispose of his property by will as he pleases, however absurd and unjust the dispositions may be,

according to Seguine v. Seguine (above cited), and the fact of such absurdity and injustice does not raise an inference of want of mental capacity, as held in Deas v. Wardell (above cited), it seems to me to result logically that in this case the question of unsoundness of mind on the part of the testator at the time he executed the instrument propounded as his will, after having disposed of the other evidence upon the subject, remains to be determined from the alleged failure of memory indicated by the will itself.

What are those evidences? *First*, it is alleged that he mistook, and stated his age to be, 75, when it was nearly 77, and that he called his second daughter his third daughter, and his third daughter his second daughter, and two so-called adopted sons of his daughter and deceased son, his grandsons, and it is claimed by contestant's counsel that he also forgot the existence of the daughters of his daughter, Mrs. Woltman, and the son of his deceased son, James. But the fact that they are not named in the will is entirely consistent with his remembrance of them, and disinclination to make them beneficiaries; and in the absence of any positive proof upon the subject, we are bound to assume that he omitted them for what appeared to him to be good cause; at all events, he had the legal right to omit them, and the fact that he did, does not prove that he forgot them.

As to the miscalling of the so-called adopted grandchildren, I have already considered that question.

In Bleecker v. Lynch (1 *Bradf.*, 458,) Surrogate Bradford says (p. 466): "The strongest deduction from the testimony adduced to impeach the capacity

of the testatrix reaches no further than defect of memory, which, unless it be total, or appertain to things very essential, is not sufficient to create incompetency. The memory is the first faculty to wane in the progress of age." It appeared in that case that the testatrix had failed to recognize her grandchildren, and had mistaken them for other persons.

In Creely *v.* Ostrander (3 *Bradf.*, 107), a half-sister's name was omitted, and it was claimed to have been from forgetfulness or accident. Judge Bradford (p. 114) says: "But on the latter hypothesis (that her name was omitted from forgetfulness or accident), no court would be justified in setting aside the will, for that must be the effect of attempting to rectify this supposed error."

In Van Alst *v.* Hunter (5 *Johns. Ch.*, 148), the learned Chancellor Kent says (at page 160): "Failure of memory is not sufficient to create incapacity, unless it be quite total, or extend to his real estate, family, and property. * * * Want of recollection of names is one of the earliest symptoms of decay of memory, but this failure may exist to a very great degree, and yet the solid power of understanding remain," and in that case the testator was 84 years, of age.

In Boell *v.* Schwartz (4 *Bradf.*, 12,) it is held that it is not sufficient ground for refusing probate that error as to a matter of fact has been made by the testator, unless, indeed, the mistake has been of such a character as to affect his testamentary intention.

*Shelford on Lunacy* (p. 41) defines a sound mind as one wholly free from delusion, all the intelligent

faculties existing in a certain degree of vigor and harmony, propensities, affections and passions being under subordination of the judgment and the will, the former being the controlling power, with a just perception of the natural connection or repugnancy of ideas. Weak minds, again, only differ from strong ones in the extent and power of their faculties; but unless they betray symptoms of a total loss of understanding, or of idiocy, or of delusion, they cannot be considered unsound.

Redfield (1 *Redf. on Wills*, 105,) says: "It seems to be the result of all the cases, English and American, that mere forgetfulness alone will not disqualify one from making a will."

This statement of Shelford is fully recognized and approved in Blanchard v. Nestle (3 *Den.*, 37), and in Stewart's Executors v. Lispenard (26 *Wend.*, 255), where it is held that the term "unsound mind" in our statute is used as synonymous with *non compos mentis*.

In Stevens v. Van Cleve (4 *Wash. C. Ct.*, 262,) a number of witnesses for the contestants testified that the memory of the testator was greatly impaired before he had a stroke of palsy; that he would ask foolish questions — enquire the names of his mere acquaintances who called to see him. Upon one occasion he enquired how a personal acquaintance of his was. Being answered he was dead, he not long afterwards expressed a wish to see him. At another time he mistook one of his nieces for a granddaughter, who had a long time been dead. Many similar instances of great decay in his memory were stated by these witnesses.

Washington, J., in charging the jury, said (p. 270) : "Although the testator's memory had greatly failed, even to the extent stated by many of the plaintiff's witnesses, may he not have spoken and acted precisely as the four witnesses who were with him when the will was executed, have sworn he did?"

In Jackson *v.* King (4 *Cow.*, 207,) it is held that one *non compos* is one who has wholly lost his understanding, and that it does not follow that because one would be a proper subject of a commission in the nature of a writ *de lunatico enquirendo,* that his acts are void, or voidable, in a court of law. Woodworth, J. (p. 218), says: "The testimony adduced at the trial clearly shows that the grantor is not included in the legal definition of *non compos.*   *   *   * *   * It is true a number of the plaintiff's witnesses show that he did not recollect persons coming to his mill; that he took no part in the settlement of his accounts, although present; that he indulged in idle stories; that he talked of turning the water back, so as to gain the benefit of it a second time; that he was incoherent and unconnected in his statements, and greatly affected by very trifling circumstances. I admit these are proofs of a much impaired understanding, but they do not satisfactorily prove anything more."

It is worthy of special remark in this case that while the rules of evidence would have warranted proof, subsequent to the execution of the will, of deceased's unsoundness of mind, there has been no evidence given in the case indicating any failure of memory, or conduct evincing an unsoundness of mind;

but the testimony of Dr. Ball, Mr. Livermore, Mr. Worl, and Mr. Mairs, together with the evidence given by Dr. Freligh and Dr. Freeman, all shows the continued mental vigor of the deceased, down to about the time of his death.

From these various authorities, I am of the opinion that the evidence discloses such mental soundness at the time of the execution of the instrument propounded, as to warrant the admission of this will to probate. Of course the mistakes of fact contained in the will, as to the order in which his daughters were born, indicates some defect of memory; but the description by name is sufficient to make the legacies certain; and while it must be conceded that the terms of the will seem to dispose of the property unfairly, and I could wish that a better explanation of that inequality could have been furnished the court, yet to reject it on that ground would be an unwarrantable assumption of authority to dictate the terms of the testator's will, and with the entire absence of proof, from the time the will was executed down to the death of the deceased, of any impairment of mind, I should regard it as a most dangerous assumption to set aside this will because of his failure to rightly describe in order his second and third daughters. If such a mistake as that should be accepted as evidence of unsoundness of mind, what would become of the numerous cases in the books, where mistakes are made in the description of legatees, and of legacies; as in the case of Stockdale v. Bushby (19 *Vesey*, 381), where the testator bequeathed to Thomas Stockdale, the second son of his brother John, when his brother had no

son by name of Thomas, and his second son was called William, and William was adjudged to be entitled.

In South v. Merrick (1 *Bro. C. C.*, 40), the testator gave his residuary estate to his six grandchildren. In naming them, the name of Anne was repeated, and Elizabeth omitted. The court rectified it by admitting Elizabeth to an equal share.

In Humphries v. Humphries (2 *Cox*, 186) the testator gave his residuary estate equally to his seven children, naming, however, but six, and he had eight; but it appeared from the will that one of them he considered provided for, and the court decreed seven to take the residue in equal shares. And in another class of cases where the context of the will is insufficient for the purpose of establishing a description and correcting the error, parol evidence is admitted to prove the mistake and ascertain the person intended.

In Masters v. Masters (1 *P. Williams*, 421) the testatrix gave £200 to Mrs. Sawyer, and there was no such person; but it was claimed she meant Mrs. Swopper, and the court directed the master to enquire who the testatrix meant, and whether Mrs. Swopper was not intended.

A bequest of £500 having been made to the Reverend C. S. Smith, of Stapleford Tawney, County of Essex, clerk — the Reverend Richard Smith claimed the legacy, upon evidence that there was no person answering the description of the legatee, according to the will, and that he was, at the date of the will, the incumbent of Stapleford Tawney, known to deceased, who had regard for him; and upon Lord Alvanley expressing an opinion in favor of Richard Smith, the

executor withdrew his opposition, and the claimant took a decree. (Smith v. Coney, 6 *Ves.*, 42.)

In Thomas v. Stevens (4 *Johns. Ch.*, 607) the legatee was named Cornelia Thompson, but her real name was Caroline Thomas. On it appearing that the latter was meant by the testator, she was decreed entitled.

In Hart v. Marks (4 *Bradf.*, 161) an annuitant was described by the testator as his cousin, Paris Pickard. Parol evidence was given to show that his cousin, Priscilla Pickard was usually called by him Paris Pickard. It was held that the person intended might be shown by parol evidence.

If any such lapse of memory is to be taken as evidence of unsoundness of mind, then none of these cases should have been determined as they were, and the legacies or legatees intended and ascertained; but, according to the contestant's point, the various wills named should have been rejected, because they furnished evidence of unsoundness of mind.

In addition to the considerations which have already been suggested, the fact that the deceased drew out, in his own handwriting, the instructions in respect to the dispositions of his will, as well as the corrections in the draft will made by his attorney, are quite persuasive of the mental soundness of the deceased at the time he executed his will.

I have not deemed it necessary to discuss the sufficiency of the reasons given by the deceased for the larger legacy to his daughter, Sarah, or the absence of any to his son, and his grandson, Frank Mairs; for, as to the first, from the whole evidence

it is quite apparent that his daughter, Sarah, did substantially attend to her mother during her long illness, and that she remained an inmate of deceased's house, doubtless with his approbation, and it was not unnatural that, under these circumstances, he should have felt a special interest in her welfare, though evidently it was his duty to have dealt more equally with all his children. It is impossible to escape the conclusion in this case that the relationship between the various members of the doctor's family, including himself and wife, were somewhat extraordinary, or rather it is quite apparent that between the doctor and his family, generally, there was no noticeable cordiality, but the facts are not sufficiently disclosed to enable me to determine who was at fault, much less to adjudge that it was due to the unsoundess of mind of the testator.

From the best consideration I have been able to give to the testimony and the authorities applicable to this case, I am of opinion that the decedent was of sound and disposing mind at the time he executed the instrument in question; that it was executed in substantial compliance with the requirements of our statute, and free from restraint or undue influence, and should therefore be admitted to probate.

Ordered accordingly.