New York County.—Hon. D. C. CALVIN, Surrogate.— January, 1881.

## Townsend v. Bogart.

*In the matter of the probate of a paper propounded as the last will and testament of* Mary Elizabeth Hatfield, *deceased.*

The decedent, who was an unmarried woman, owning real estate of considerable value, died in November, 1879, aged about fifty-two years, in

the house of her cousin, with whom she had resided since the death of her mother in 1862, having previously resided with the latter. She was a member of a church; attended church and Sunday school regularly; took care of her room and person; could do some light housework and needlework; but was not in vigorous health; was afflicted with stuttering; uttered only short sentences; never learned to read or write, though she had attended school for three years; could not count more than ten, or tell the time of day from the clock, or add or multiply; had no idea of the value of property, or of money beyond ten cents; was easily lost in familiar streets; had no understanding of the amount of her property; had two sisters, one of whom was in an insane asylum; was herself adjudged an idiot in 1871; and otherwise evinced a weak mind, being unable to attend to most things which persons of ordinary intelligence can do. Her alleged will, signed by a cross, bore date in 1869, and left all to a member of the family in which she lived, the daughter of her cousin, who was present when she visited a lawyer's office, where the will was drawn, and also at the time of the alleged execution, the devisee's brother writing decedent's name around the cross. *Held*, that decedent was not of sound and disposing mind, at the time when the will purported to have been executed, and that the instrument should be refused probate.

While the law does not undertake to test a person's intelligence, and define the exact quality of mind and memory which he must possess to authorize him to make a will, it does require him to have a mind to know the extent and value of his property, the number and names of those who are the natural objects of his bounty, their deserts in reference to their conduct towards him, their capacity and necessities; that he shall have sufficient active memory, to retain these facts in his mind long enough to have his will prepared and executed; and if this amount of mental capacity is somewhat obscure or clouded, still the will may be sustained.

The use of the term *compos mentis*, as a standard of testamentary capacity, is liable in certain cases to mislead,—not all who come within that description being competent to make a will.

An adjudication of the idiocy of an alleged testator, made two years after the date of the alleged execution of the will, while neither conclusive nor binding on the surrogate's court, upon an application for probate, is to be distinguished from an adjudication of lunacy in a like case, which would, *it seems*, be less significant.

The policy of the statute (2 *R. S.*, 60, § 21), limiting the age under which a person cannot be a testator,—explained.

APPLICATION for the probate of a will.

Objections were filed on behalf of Emeline Townsend, a sister of decedent, on the ground that it was not the

last will of decedent; that the contents were never known to her; that she never declared it to be her last will; that she never requested the witnesses to subscribe; that she was not of sound mind; that it was procured by fraud, circumvention, misrepresentation and undue influence by John W. Bogart or Ellen Bogart; and that it was not freely or voluntarily executed.

The instrument propounded bore date December 1, 1869; purported to have been executed by a cross, and was witnessed by Dr. John W. Warner and Francis Bennett. After providing for the payment of debts, it gave and devised all decedent's estate, real and personal, and all her chattels and property of every kind and description, to her cousin Ellen Bogart, daughter of Anderson Bogart of the city of New York, her heirs and assigns forever, and appointed John W. Bogart sole executor.

It appeared that decedent, who was an unmarried woman, died in November, 1879, aged about fifty-two years, in the house of Anderson Bogart, her cousin, in New York city, where she had resided since 1862; she was not of vigorous health, was afflicted with stammering, and had a sister in an insane asylum, and another sister in Milwaukee. She owned real estate of considerable value in New York city, and was a member of the Methodist Episcopal church in Twenty-seventh street.

Dr. John W. Warner testified, for proponent, that he was a physician residing in New York city; that he knew decedent in her life-time; that his signature was attached to the paper propounded, which was executed at its date, at Mr. Bogart's house; he was requested to go to the house as a witness, by Mr. Bogart, where he saw de-

cedent, Mr. Francis Bennett and Mr. Bogart; he thought decedent informed him she was about to execute her will, and after she signed it he witnessed it, in the presence of the other witness and decedent, at her request; he was familiar with the requirements of such execution, and if anything had been irregular, he would have noticed it; she executed it freely, and he had no doubt she was of sound mind.

On cross-examination, he testified that when he arrived at the house, decedent was sitting at the table, in the back parlor, and he was introduced to her by Mr. Bogart; the paper propounded was lying on a stand or table, where decedent was; decedent's name was written before she made her mark, but he could not tell by whom, and it was his impression that decedent said it was her last will and testament. She said : " Gentlemen, I desire you to witness my last will and testament," or something to that effect; he shouldn't have thought that she was otherwise than of sound mind from her appearance; he didn't think a physician could form a competent judgment as to the lunacy of a person, by means of such an interview.

On re-direct examination, he testified that he would need facts, upon which to base his opinion that she was of unsound mind; that he saw nothing abnormal in her condition, and believed her sound at the time.

Francis Bennett testified for proponent that he was a subscribing witness to decedent's will; he knew decedent and the last witness, and was asked by one of the family to come down into the parlor in the evening, to witness the instrument; he found Dr. Warner, decedent and Mr. Bogart present with decedent, and the in-

strument lying on the table ; decedent asked him to witness it, saying that it was her last will and testament ; he saw her sign it,—make her mark ; that he signed it a few minutes after the other witness, both in the presence of decedent ; he had lived in the family two or three years, and in his opinion her mind was sound ; he couldn't say who wrote decedent's name to the instrument ; there was nothing peculiar in her actions ; she requested the other witness to subscribe at the same time ; she was not under restraint ; he had known her two or three years, meeting her every day at meals.

On cross-examination, he testified that he did not recollect the words used at the execution, and did not know what became of the paper afterwards; that he never had any protracted conversation with decedent, but they talked about different matters at the table ; elsewhere he may have said good-morning, good-evening ; he recollected conversations with her as to ordinary subjects of life ; he could recall no conversation at the table ; decedent sat near Miss Bogart and addressed her remarks to her ; he judged decedent could not write, from her making her mark ; he had seen her in Lexington avenue alone ; that she carried a card with her, addressed, so that, in case she was lost, she could be identified ; decedent talked with other persons at the table, and was a reasonable person, and he was satisfied that all things were done as stated in the attestation clause.

John W. Bogart testified for proponent, that he knew decedent ; he saw decedent's will at Lexington avenue at the time of its execution, and he wrote decedent's name at her request, and asked her whether it

was her last will; she said yes; he then wrote her name around the cross.

On cross-examination, he testified that Mr. Bogart, and witness's sisters, Ellen and Clara, were present; that he had repeatedly heard decedent say she intended to leave all her property to witness's sister, Ellen; she said she had left it all; that she said that to him, repeatedly.

The further facts sufficiently appear in the opinion.

TOWNSEND WANDELL *and* JACOB F. MILLER, *for proponent.*

ANDERSON & MAN, *for contestants.*

THE SURROGATE.—The testimony, upon which it is claimed that the decedent was of sound and disposing mind, is substantially that of Dr. Warner, one of the subscribing witnesses to the will propounded, who testified that he had no doubt decedent was of sound mind; that from her appearance he thought she was of sound mind, though he did not think a physician could form a competent judgment by means of such an interview; but he observed nothing abnormal in her condition:—that of the other subscribing witness, Mr. Bennett, who testified that he had lived in the family two or three years; that he thought decedent's mind was sound, and that there was nothing peculiar in her actions; he could not recollect what was said by her at the execution, and never had any particular conversation with decedent, except casually at the table, and that he had seen her in the street alone, though she carried a card, with her address, to avoid being lost; that he thought her a reasonable person:—that of Mr. Anderson Bogart, father of the sole devisee, that he went with decedent to Mr. Whitbeck's

office ; that she said she wanted to give all her property to witness's daughter Ellen, who was present when the will was prepared :—that of Mary Bogart, another daughter, who heard decedent say that she had made a will, and left her property to Ellen ; that decedent spoke of her will, and of family concerns, though witness had not seen her within six years of her death :—that of John W. Bogart, brother of the devisee, that decedent declared the instrument to be her last will, when he was present at its execution, and that she repeatedly said that she intended to leave all her property to Ellen, and after the will said she had :—that of Mrs. Rhoades, that she saw decedent at church, and that she would talk of flowers, and about the church, and that she intended to give all she had to Ellen, because she was good to her ; that her conduct was rational ; that she talked right, though not much ; that she was sensible, and would tell how she liked a new preacher, say that she loved the Saviour and God's people, and gave that as a reason for going to church ; that she couldn't recall any sentence that she ever uttered at length ; that she spoke of her sister, Mrs. Townsend, who resided in Milwaukee, saying that she did not treat her well, and that she did not want her money to go to her, because she had neglected her :—that of Charles W. Bogart, another brother of the devisee, that he talked with her in ordinary conversation ; that she spoke of her sister, Mrs. Townsend, thought she had treated her badly, that she had borrowed money of her, and never paid principal or interest ; spoke of her property in connection with Mr. Cook, who had charge of it ; that she would do certain kinds of housework, sewing, and keeping her room in order ;.

could tell a good penny from a bad one ; spoke to him of her house in Seventh street, saying that Ellen should have it, and her sister in Milwaukee should not, because she had borrowed money of her and not repaid it ; that she went to the Seventh street house alone frequently, and to church and Sunday-school ; she would speak of the text and church affairs ; he thought her rational ; she would give the substance of the text and sermon ; he had seen her try to write :—that of Mrs. Marsh, that she had been to the store to get things, and would come back with them ; she would get what she was told to ; she was intelligent and sensible, answering questions as well as other persons :—that of Clara P. Bogart, sister of the devisee, who testified that she would converse upon ordinary topics respecting the church and Sunday-school, and about what the preacher said ; kept her clothes in order ; did certain housework ; had been to Stewart's alone ; purchased shoes and candies, and said she would leave her property to Ellen ; called her sister hard names because she had not treated her kindly ; that her conversation seemed rational ; she knew five-cent from ten-cent pieces, but that was the extent, and bad pieces from good ones ; she had no schooling and could not count or read, but could copy the alphabet on a slate :— that of Mrs. Leidy, that she had had several conversations with decedent, and met her at the door when she called, and asked if Clara was at home ; if not, she would say so ; had seen her do various matters of housework ; she had taken notes for Miss Bogart to different places, and that her conversation was rational ; that there was a marked difference between her and Miss Bogart ; she talked rationally.   To about the same effect

is the testimony of Ellen Bogart, the devisee, together with the testimony of Mr. Anderson Bogart, her father, who attempts to explain away the force of his affidavit made in the idiocy inquiry, on the ground that he did not understand the object of the proceedings ; but he testifies that the statements of fact, made in the affidavit, he knew to be true at the time.

The testimony militating against decedent's mental capacity is, in substance, that of Mr. Searles, that decedent could not carry on connected conversation, and could not read ; when twenty or twenty-three years old, she would give him trifling presents of no value, a small amount of worthless pictures ; that her conversation was not intelligent, and she seemed to grow worse, rather than better, and after her mother's death was not able to go about, but would, call persons by their names in the house :—that of Mrs. Holmes, that she would speak like a child ; could not tell the time of day by the clock, and would give persons pictures cut out of magazines, old pieces of calico and silk ; used to state, as her reason for not riding in cars, that she could not tell where to go when she left them ; that in his opinion her acts and conversation were not rational ; she manifested an unpleasant feeling towards Mrs. Townsend, her sister, on account of her having borrowed money and not paying ; and that he heard her speak of her sister who was in the insane asylum :—that of Thomas Boese, who was one of the commissioners on the inquiry on which she was declared an idiot, that she was questioned before the jury, and did not seem to understand the questions or make intelligent answers :—that of Mr. Man, the counsel who conducted those proceedings, that he

visited decedent for the purpose of ascertaining her mental condition, as a justification of the proceedings ; in conversing with her, she did not seem to understand what was said to her, or make intelligent answers when questions were put to her ; seemed dazed and looked at Mr. Bogart ; that he had two interviews before the proceedings :—that of Mr. Cook, who was appointed committee, that she did not know her letters and could not conduct any conversation connectedly ; did not seem to be capable of giving a rational answer ; her conversation and conduct were irrational ; that Mrs. Townsend, her sister, borrowed of decedent's mother $2,000, and gave a note which she did not pay :—the deposition of Mrs. Townsend, taken on commission, that decedent was easily influenced and controlled ; that her acts and conversation were irrational ; she could not learn her letters, or reckon the multiplication table, or count numbers ; that she attended school three years ; she met with an accident by falling against a stove hearth, striking her forehead, from which she was sick, and the doctor said her skull was indented, and pressed on the brain ; that decedent became simple after that :—the deposition of Charles W. Brown, a nephew of decedent, and son of Mrs. Townsend by a former husband, taken on commission, who testified that decedent could not carry on conversation, did not understand the meaning of ordinary English words, could not read or write, and did not know a letter or the multiplication table ; could not count the fingers on her hand, or tell the value of money, or recall any event in her life, except something marked, like the death of her mother ; was irrational in her acts and conversation ; that he tried to see if she

could tell the difference between twenty-five-cent pieces and fifty-cent pieces, and she failed :—together with the proceedings in 1871, in which she was duly declared, by the supreme court, on such inquiry, an idiot, and a committee appointed, the proceedings being initiated by Mrs. Townsend, but based principally upon the affidavit of Anderson Bogart, the father of the devisee, that she was of weak mind, could not read or write, or count ten or a less number, or tell the time by clock or watch, or go about the streets alone, unless several times pointed out to her ; was easily lost, and had to take a card with her, showing her address ; could not reckon money or tell the value of anything.

The affidavit of Mr. Cook was substantially to the same effect ; and it appears that, upon the testimony of these witnesses, together with the examination of the decedent herself, she was regularly adjudged an idiot, and a committee appointed, although Mr. Bogart and his daughter seek to break the force of the testimony set forth in their affidavits, by claiming that they did not understand the nature of the proceedings, yet were not willing to testify that the statements made by them were untrue.

In the case of Mairs v. Freeman (3 Redf., 181), I had occasion to examine with care the extent of mental capacity required for the execution of a will, and the numerous authorities bearing upon that subject ; and the general doctrine laid down by Swinburne, 127, 8, approved by Shelford on Lunacy (1st ed.), 37, that a man of mean understanding, yea, though he incline to the foolish sort, is not prohibited to make a testament ; and that of Stewart's Ex'r v. Lispenard, 26 Wend., 301, that a person being of weak understanding, so he be neither an idiot

or lunatic, is no objection in law to his disposing of his estate.    Courts will not measure the extent of a person's understanding or capacity.    If a man therefore be legally *compos mentis,* be he wise or unwise, he is the disposer of his own property, and his will stands as a reason for his action, where not revoked ; but the term *compos mentis,* for the purpose of enabling a person to execute a will, is carefully considered and well stated in Delafield *v.* Parish (25 *N. Y.,* 9); Van Guysling *v.* Van Kuren (35 *Id.,* 70) ; Tyler *v.* Gardiner (35 *Id.,* 559) ; Kinne *v.* Johnson (60 *Barb.,* 69);  Bundy *v.* McKnight (48 *Ind.,* 502) ; Meeker *v.* Meeker (75 *Ill.,* 260).

In the last case, it was held that the incapacity preventing the making of a valid will, must be such as prevents a person from understanding the effect and consequence of his acts, from reasoning correctly, and understanding the relation of cause and effect in ordinary business affairs ; but mere weakness of mind does not incapacitate.

In Bundy *v.* McKnight, above cited, the doctrine is to my mind best expressed, that the law does not undertake to test a person's intelligence, and define the exact quality of mind, and memory which a testator must possess, to authorize him to make a will, yet it does require him to possess a mind to know the extent and value of his property, the number and names of the persons who are the natural objects of his bounty ; their deserts, in reference to their conduct and treatment towards him; their capacity and necessities ; that he shall have sufficient active memory to retain all those facts in his mind, long enough to have his will prepared and executed ; and if this amount of mental capacity is somewhat obscure, or clouded, still.

the will may be sustained. The use of the term *compos mentis*, which some of the courts make the standard of testamentary capacity, and as meaning "sound mind," is liable in my opinion to mislead in such a case as this, for a child ten years old of ordinary intelligence could not be said to be *non compos mentis*, and yet no one would pretend that such a mind could grasp the facts which are made the test of testamentary capacity by the authorities above cited ; and the fact that our statute fixes the ages, when persons of sound mind may execute a will, is indicative of the judgment of the legislature that a person under that age is not of sufficient mental capacity, presumably, though with ordinary intelligence, to execute such an instrument, and possessed of the mental qualifications thus prescribed.

By section 23 of 3 *R. S.*, 60 (6 ed.), every male person of the age of eighteen years or upwards, and every female of the age of sixteen years or upwards, of sound mind and memory, may give and bequeath personal estate by will, and it seems to me that that provision is a legislative intimation, that persons under that age are presumed to be mentally incompetent to the disposition of their property by will. The discrimination between males and females must be based upon the theory, which is confirmed by common experience, that females mature earlier than males, and though the decedent was disposing of real estate by her will, yet I do not deem it necessary to consider the discrimination made by the legislature, in regard to the age of those who are authorized by statute to devise their real estate by last will and testament. This power is limited to adults, except idiots and persons of unsound mind, though I am not able to

perceive any substantial reason for such a limitation, except upon the assumption of sound mind, based upon the age of the testator.    See section 1, p. 57, of same statute.

But, accepting the statute relating to testamentary disposition of personal property as the standard and test, and comparing it with the testimony given in this case, was the decedent in her mental capacity, at the time she executed the instrument in question, up to that standard? It is true that she appeared to recognize acquaintances, did certain routine domestic work, remembered her sister, and felt unkindly towards Mrs. Townsend for a reason which she seemed not to understand, and to entirely misconceive, for she supposed that she had borrowed money of her, and had not repaid it, while the fact was that the borrowing was of decedent's mother, and her mind seemed to have been materially prejudiced against her sister on that account.    It is true also that she attended Sunday-school, and church, and went to familiar places alone, and made trifling purchases under the instructions of others ; that she could repeat the Lord's Prayer, remember a text of the clergyman, and state something of what he said ; that she stated she intended to give her property to her second cousin, and that her sister should not have it, for reasons above stated, and because she had neglected her ; and that she, after its execution, stated that she had made a will, thus disposing of her property, and that she went to the attorney who drew the will, and gave him instructions as to what she desired to do with her property.

Taking all these facts into consideration, with the other indisputable facts proved by witnesses on both

sides, that though she attended school for three years, she did not learn to read or write, never learned to count more than ten, could not tell the time of day from clock or watch, could not add or multiply, had no idea of the value of property, or of money beyond ten cents, could not tell where to go when she left the cars, and when she went out alone to familiar places on familiar streets, carried with her a card with her address, lest she should be lost, it being deemed necessary by her friends ; that she was of weak mind, unable to do or attend to most things which most persons of ordinary mind and intelligence could do ; that she was easily lost ; could not reckon money ; had no idea or understanding of the amount or the value of her property, the value or worth of anything,—it is quite apparent that her intellectual capacity was not equal to that of an ordinary intelligent child of ten years of age.

How can it be said that she had any intelligent understanding of the value of her property, which she was disposing of by will, when she had no appreciation of values ? That fact alone seems to indicate that she could not have known whether she was disposing of property worth five dollars or five millions.

It is very difficult to say that decedent was not laboring under an obvious delusion, which affected her testamentary disposition, in respect to her sister, Mrs. Townsend, unless she was mentally incapable of appreciating the difference between the obligation of that sister to her mother by reason of borrowing $2,000, and that to herself ; and it is equally difficult to reconcile her will with an intelligent appreciation by her of the relation she bore to her sister who was in the insane asylum, and

her duty towards her, and her just claims upon her bounty.

The circumstance that she went to the attorney, and gave instructions respecting her will, is very materially weakened by the fact that she was accompanied by Mr. Bogart and the devisee, and that the will was of the simplest character, and its terms very easily fixed upon her mind by a little tutoring.

These circumstances, aside from the proceedings in idiocy, seem to me to forbid the admission of this will to probate, but when taken in conjunction with those proceedings and their result, though they are obviously neither conclusive nor binding upon this court in the determination of this case, it seems to be impossible to escape the conviction that decedent, when she made this instrument, was not possessed of sufficient mental capacity to understand the effect of the disposition, and the condition or value of her property, or the just claims of her sisters upon her bounty. For be it remembered that these proceedings were substantially sustained by the testimony of Mr. Bogart and one of his daughters, and that all the efforts to explain and escape the force of the testimony, on the ground that they did not understand the nature of the proceedings and its purpose, in no way controvert the facts to which they testified; and the effort to belittle the significance of that adjudication, on account of Dr. Warner not being present, and the hasty disposition of the case, signally fails, for the testimony of Mr. Boese, one of the commissioners, and that of Mr. Man, an experienced and intelligent lawyer, who made a careful examination of the decedent before the proceedings were taken, and had two interviews, show that the

proceedings were conducted with proper precaution, and leave no doubt in my mind that the finding of the jury was in accordance with the facts.

If this were a case of lunacy, it might very well be that the inquisition in lunacy, two years after the execution of the will in question, might not be very significant, for the reason that lunacy might be the result of disease or sudden accident, or development of hereditary mental taint; but the imbecility of mind which was manifested in the case of the decedent was not one of sudden development, and some of the proponent's witnesses indicate that, in their opinion, after the death of her mother and under the care of the Bogart family, she improved in her mental condition, and its manifestation ; and I am of the opinion that, if the decedent was an idiot when the inquisition was had, it is impossible, on the proof in this case and from the nature of the affliction, that she could have been of sound and disposing mind when this instrument was executed.

I am of the opinion that, from the proof in this case, decedent was not of sound and disposing mind when she executed the instrument propounded, and that for that reason the will should be denied probate.

Decreed accordingly.